State v. Butler.

# THE STATE v. BUTLER, Appellant.

## Division Two, December 9, 1903.

1. **Attempt to Bribe:** NECESSARY ELEMENTS. In order to sustain a conviction under the statute which declares that every person who shall directly or indirectly offer to give any money to any public officer of this State or a city thereof, with intent to influence his vote, opinion, judgment or decision on any question which may by law be brought before him in his official capacity, shall be guilty of an attempt to bribe, three elements denounced by the statute must be shown to exist, to-wit: First, there must be a public officer of the State or city; second, the offer must be made with intent to influence the vote, etc., of such public officer; and, third, the vote, etc., must be in respect to some question which may by law be brought before the public officer in his official capacity. The absence of any one of these elements will be fatal to the charge, because not within the terms of the statute defining the offense.

2. ———: ———: PUBLIC OFFICER: LEGAL CAPACITY TO ACT. If the Board of Health of the city of St. Louis could not by law make a contract for the removal of garbage, etc., an offer to give a member of that board twenty-five hundred dollars to award such contract to a certain company, was not an attempt to bribe within the meaning of the statute.

3. **Municipal Assemblies:** POWERS LIMITED BY CHARTER. All powers of a municipal assembly emanate in and are limited by the city's charter, and every legislative act thereof must find support in the express or implied powers granted to the city by that charter.

4. ———: ———: GENERAL AND SPECIFIC POWERS. A municipal assembly can not invest a board of public health with power to contract for the removal of garbage under a general clause in the charter authorizing it to "establish and maintain a sanitary system," where there is a specific charter provision declaring that contracts of that kind can be made only by another board. The powers of a municipal assembly to pass by-laws under a general-welfare clause can never be exercised to enlarge or annul specific provisions.

5. ———: ———: BOARD OF PUBLIC HEALTH: GARBAGE: PUBLIC WORK. The Municipal Assembly of St. Louis can not pass an ordinance authorizing the Board of Public Health to contract for the removal and disposal of all slops, offal, garbage, animal and vegetable matter

State v. Butler.

from streets, alleys, public grounds and private premises. Such work is, within the meaning of the city's charter, a public work, and under that charter the Assembly has "no power to contract for any public work, nor fix the price or rate therefor." The charter provides that the Board of Public Improvements "shall let out said work by contract," and that "any other mode of letting out or contracting for work shall be held as illegal and void."

6. ———: ———: RULE OF CONSTRUCTION. If there is a fair, reasonable doubt concerning the existence in the charter of the Municipal Assembly's power to pass such an ordinance, the doubt must be resolved against it.

7. ———: ———: SUPPLIED BY ACQUIESCENCE. The absence from the charter of a power can never be supplied by acquiescence or construction. The recognition by the various departments of a city that the municipal assembly had the power to authorize the board of public health to contract for the removal of garbage from public places and private premises, and an acquiescence by them in the exercise of that power in that way, for any length of time, can never legalize the exercise of that power.

8. Attempting to Bribe: GARBAGE CONTRACT: BOARD OF PUBLIC HEALTH. Under the charter of St. Louis any ordinance which authorizes the Board of 'Public Health to contract for the removal of garbage from public places and private premises, is void, and hence an offer to give to a member of that board $2,500 for the award of such contract to a certain company is not, within the meaning of the statute, an attempt to bribe, since it was not something that such member could by law do.

9. ———: LAW MUST BE IN FORCE. The words, "which may by law be brought before him," in the statute denouncing an attempt to bribe a public officer, mean a law in force at the time of the offer to bribe.

10. ———: POWER TO ACT. There can be no bribery of an official to do a particular act, unless the law requires or imposes upon him the duty to act. He can not be influenced to do something he has no power or authority to do.

11. ———: VALIDITY OF ORDINANCE: COLLATERAL ATTACK. The validity of an ordinance authorizing the Board of Health to make a certain contract, may be determined in a criminal case charging the defendant with an attempt to bribe a member of that board to give the contract to a certain company. In such case the invalidity of the ordinance is not determined from any extraneous facts, but from the charter and ordinance introduced in evidence.

State v. Butler.

12. ———: BEFORE ORDINANCE WAS SIGNED. An offer of money to a member of the Board of Health to influence him to award a contract authorized by an ordinance which had been passed by the Municipal Assembly, but not signed by the mayor, who is by the charter a part of the lawmaking power of the city, is not an attempt to bribe within the meaning of the statute, for the reason the member was not then authorized by law to act in the matter. Until the mayor signed the ordinance, there was no law on the subject, and hence, no duty in respect thereto could be brought before the member "in. his official capacity." In such case the verdict can not stand, even if the ordinance afterwards became a valid one.

13. ———: ———: INSTRUCTION. Unless the instruction in such case advises the jury that the ordinance was not legally passed until it was approved by the mayor, but simply requires them to find that it was "passed" by the Assembly, it is erroneous.

14. ———: ———: FINDING OF JURY. Where all the evidence shows that the offer to bribe was made before the ordinance authorizing the officer to act was signed by the mayor, the finding of the jury that the offer was made after he signed it, will not be permitted to stand. When there is no evidence on which to base the finding of the jury, the court will not be bound by it.

Appeal from Boone Circuit Court.—*Hon. Jno. A. Hock-aday*, Judge.

REVERSED.

*T. J. Rowe* for appellant.

(1) The ordinance upon which depended the authority of the board of health is void. First. It is void because the contract being for public work, the ordinance should have emanated from the Board of Public Improvements, and should have provided for the letting of the contract by such board. Charter St. Louis, art. 6, sec. 27; State ex rel. v. Barlow, 48 Mo. 17; Cole. v. Skrainka, 37 Mo. App. 433; Id., 105 Mo. 303; City v. Gleason, 89 Mo. 67; State ex rel. v. City, 161 Mo. 371. Second. It is void because under the charter the Municipal Assembly has no authority to empower the Board of Health to make contracts. (a) The health department is the health commissioner. Charter, art.

12, secs. 1, 2, 3. (b) Even in matter of abatements of nuisances, he is the department. Id., secs. 6, 7. (c) The charter is barren of an authority in the board to contract. (2) The ordinance undertakes to delegate to the Board of Health the legislative powers of the Assembly. Ruggles v. Collier, 45 Mo. 353; Sheehan v. Gleason, 46 Mo. 100; Trenton v. Coyle, 107 Mo. 193. (3) The indictment is repugnant, because it shows by its averments that there was nothing which was to come before the Board of Health. The defendant is alleged to have averred that a bid was to be made, but the indictment does not aver that such proposition was in fact about to be made. State v. Burke, 151 Mo. 136; In re Yee Gee, 83 Fed. 145; State v. Howard, 137 Mo. 289. (4) By reason of the invalidity of the ordinance, there was no subject-matter of inquiry which could by law be brought before the Board of Health for the vote or decision of its respective members. Hence, the indictment does not state an offense under the statute. R. S. 1899, secs. 2084, 2089; Conner v. Reese, 29 S. W. 352; Newman v. State, 97 Ga. 367; Gunning v. People, 59 N. E. 494; United States v. Boyer, 85 Fed. 425. The ordinance pleaded in the indictment does not show that the Board of Health had authority under the city charter to let the garbage contract. The indictment should allege all the facts which gave the Board of Health authority to act. The ordinance as pleaded in the indictment is void. State v. Terry, 109 Mo. 616. An indictment should contain an allegation of every essential fact constituting the offense. State v. Kirby, 115 Mo. 447. An indictment must allege every substantive fact which is necessary to establish the guilt of the accused, and which the State is required to prove. State v. Green, 111 Mo. 585; State v. Reed, 117 Mo. 604. An indictment must stand on its own bottom, and can not be supported or propped by instructions. State v. Hesseltine, 130 Mo. 468. The cardinal principle of pleading in prosecutions for felony is that everything con-

stituting the offense must be pleaded with certainty, and nothing is left to implication. State v. Rector, 126 Mo. 328; State v. Ferguson, 152 Mo. 92; State v. Jones, 168 Mo. 403; State v. Meysenburg, 171 Mo. 1. Courts will take judicial notice of a public statute. Emerson v. Railroad, 111 Mo. 161; State ex rel. v. Seibert, 130 Mo. 202. Courts will take judicial notice of the charter of St. Louis. Kansas City v. Smart, 128 Mo. 274. The rule is well settled in this State that courts will not take judicial notice of ordinances of a city, but they must be pleaded and proved like other facts. St. Louis v. Roche, 128 Mo. 544; Trenton v. Collier, 68 Mo. App. 483. Ministerial powers may be delegated by a city, but legislative powers can not be. St. Louis v. Russell, 116 Mo. 248; St. Louis v. Howard, 119 Mo. 41. The question of sufficiency of an indictment must be determined from the indictment itself, and is not dependent on the proof. People v. Webb, 86 N. W. 406; People v. Bates, 71 N. Y. S. 123. (5) Instruction 4, given at the instance of the State, is erroneous. The court should have instructed the jury that ordinance 20476 could not go into effect if passed by a majority vote of the Council and House of Delegates until ten days after its approval by the mayor of the city of St. Louis. Until that date it could not become the duty of the Board of Health to advertise for sealed proposals under the terms of said ordinance, or to award any contract thereunder, or to consider any matter referred to in said ordinance or discharge any duty therein defined. (6) The overwhelming weight of the whole evidence in the case sustains defendant's contention that he never saw Dr. Chapman at his residence at any time from September 1, 1901, to October 4, 1901.

*Wm. M. Williams* also for appellant.

(1) The demurrer to the indictment was well taken. The motion in arrest of judgment should have

been sustained.   (a) The contract for the sanitary disposal of garbage found in the streets and on the private premises in the city of St. Louis, is a contract for "public work."   Such a contract, under the charter of the city, can only be let by the Board of Public Improvements, and it is a condition precedent to the passage of an ordinance authorizing such work that an estimate of the costs shall first be made by said board and then the Municipal Assembly may by ordinance, approved by the mayor, empower said board to let the contract. Sec. 27, art. 6, charter; State ex rel. v. City of St. Louis, 161 Mo. 371; State ex rel. v. Barlow, 48 Mo. 16; Brambrick v. Campbell, 37 Mo. App. 465.   (b) The charter evidently contemplates one board to make all contracts for "public work" authorized by the charter and one commissioner of supplies to make the purchases for said city.   The commissioner of supplies is provided for by section 29 of article 4 of the charter.   (c) The provision in regard to public work, and confining the letting of contracts therefor to the Board of Public Improvements, can not be restricted to work arising in the departments under control of the members of the Board of Public Improvements.   The charter refers, in section 27, to all public work contemplated by the charter. (d)   There is nothing in the charter referring to the Board of Health, from which the inference can be drawn that this board was to be the contracting agent of the city in any particular.   The sections appertaining to this board confer no such power directly or by necessary implication.   Upon the contrary, the inference is almost irresistible that it was not the intention to confer any such authority upon the Board of Health. The board may abate nuisances, but when a debt is to be incurred in so doing, the work is to be directed by and under the supervision of the Board of Public Improvements.   "All contracts for work contemplated by this article, on which special taxbills are to be issued, shall be entered into by the president of the Board of

Public Improvements, in the name of the city.'' This is in the article creating and defining the duties of the Board of Health. Art. 12, sec. 7, charter. (e) The mere fact that it was a protection to the public health to dispose of the slops and garbage by the Merz process, does not authorize a departure from the charter requirements. Kean v. Klausman, 21 Mo. App. 485. (f) The ordinance can not be upheld under the ''general welfare clause.'' This clause would be broad enough to confer authority upon the Municipal Assembly and the mayor to delegate this duty to the Board of Health but for the special provisions of the charter regulating the matter and expressly providing for such contracts. Where there are special and general grants, the power to pass by-laws under the special or express grant can only be exercised as to the matters covered thereby to the extent and in the manner prescribed by such special provisions. The power is not enlarged as to these particular matters by the ''general-welfare clause.'' 1 Dillon on Municipal Corporations (4 Ed.), secs. 315 and 316. (2) (a) If the ordinance was void and conferred no power upon the Board of Health to let the contract for the sanitary disposal of garbage, then this contract was not a matter which by law might come before the board, and hence the alleged offer to a member of said board was not to influence his vote in any matter which ''may by law be brought before him.'' The indictment is predicated upon the statute and is not for a common-law offense. Newman v. State, 23 S. E. 83; Ruffin v. State, 38 S. W. 160; Commonwealth v. Reese, 29 S. W. 352; Kitby v. State, 31 Atl. 213; U. S. v. Boyer, 85 Fed. 425; Perly v. State, 2 Cal. 564; Collins v. State, 25 Tex. Supp. 202. (b) The statute is to be strictly construed, and any doubt about its meaning must be resolved in favor of defendant. State v. Burke, 151 Mo. 136; State v. Howard, 137 Mo. 289. (3) The indictment is not sufficient to sustain the conviction, as the ordinance is not sufficiently pleaded and set out to

enable the court to see from the indictment itself that it
is a valid ordinance of the city of St. Louis.   The sub-
stance of the ordinance must be set forth.   The courts
will not take judicial notice thereof.   State v. Terry,
109 Mo. 617; Schott v. People, 89 Ill. 195; 1 Dillon on
Municipal Cor. (4 Ed.), sec. 423; St. Louis v. Stoddard,
15 Mo. App. 179; Harker v. New York, 17 Wend. 200;
St. Louis v. Gleason, 89 Mo. 76.   (4) The court erred
in admitting the testimony of the witness, Dr. Albert
Merrill.   It could throw no light upon the defendant's
intent if he made the offer to the witness, Dr. Chapman,
as testified to by the latter.   State v. Spray, 74 S. W.
851; People v. Sharpe, 107 N. Y. 466; State v. Fitchette,
92 N. W. 527; State v. Vance, 94 N. W. 204; People v.
Hurley, 58 Pac. 814.   (5) The court erred in failing
to give the instruction asked by the defendant, direct-
ing the jury to return a verdict of "not guilty."   The
evidence for the State conclusively shows that the al-
leged offer to Dr. Chapman by defendant could not
have been made later than the 16th of September, 1901.
The ordinance was not approved and did not become a
law of the city until the 17th.   There was, on the 16th,
no law by which the letting of this contract might be
brought before the Board of Health.   In re Yee Gee,
83 Fed. 147; State v. Howard, 137 Mo. 289; Perly v.
The People, 2 Cal. 564.   (a) The words "which may
by law be brought before him" must mean a law in ex-
istence at the time of the offer; otherwise they would be
meaningless.   Any matter in the whole range of human
action might possibly be brought before an officer by a
law to be enacted in the future.   Constitutions and
statutes may all be amended so as to entirely change
the duties of any officer.   In re Yee Gee, 83 Fed. 147.
(b) The offense must be complete when the offer is
made.   It can not depend upon the action of some other
party in the future over which the defendant has no
control, whether an offense is or is not committed.   If
the mayor had vetoed the ordinance, there would have

been no law authorizing the consideration of the question by the Board of Health, or by which it could be brought before said board.

*Edward C. Crow*, Attorney-General, for the State.

(1)   Defendant's counsel attack the indictment because it does not set out the details of the ordinance sufficiently.   In bribery, the gravamen of the offense is the intention to influence official action by giving or offering a bribe to an official, and if all the facts necessary to constitute this be alleged, no other allegations are necessary.   3 Ency. Pl. and Pr., p. 699; 15 Ency. Pl. and Pr., p. 428.   The rule is that pleading the substance and effect of ordinances is sufficient.   Moberly v. Hagan, 131 Mo. 19; 15 Ency. Pl. and Pr., p. 427.   In 109 Ind. 391, it was held that where a school trustee was indicted for having accepted money for awarding a contract for the purchase of furniture and supplies for the school, the indictment need not contain any averment as to the kind or class, quality, or amount or description of the property contracted for or purchased. If it was not necessary to set out the terms of the contract in the case above mentioned, it surely is not necessary to set out the details of the ordinance in the case at bar.   The indictment is sufficient.   The law defining the offense of bribery refers to the attempting to corruptly influence the official action of an officer in a matter that may come before him.   State v. Biebush, 32 Mo. 279.   (2) The charter does not require ordinance to emanate from Board of Public Improvements.   The public work provided to be recommended by the Board of Public Improvements by section 17 of article 6 of the charter refers to work done wholly upon the public streets and alleys or permanent structures or repairs thereto.   The removal of the garbage is but a public utility supplied by the city for sanitary means and is not a public work, within the meaning of the charter

provision requiring the Board of Public Improvements to make recommendations therefor, because the Board of Health and not the Board of Public Improvements are supposed to have the knowledge peculiarly fitting them to preserve sanitary conditions in the city. (3) The rule of constitutional construction applied by the courts is that the greatest deference is shown by the courts to the interpretation put upon the Constitution by the Legislature in the enactment of laws and other practical application of constitutional provisions to the legislative business when that interpretation has had the silent acquiescence of the people, including the legal profession and the judiciary, and especially when injurious results would follow the disturbing of it. 21 Pa. St. 188; 77 Pa. St. 429; 23 Ill. 207; 71 Ga. 224; 15 Md. 376. The frequent passage of laws of a certain description is often taken as conclusive that they did not fall within the prohibition of a particular clause in the Constitution. Endlich on the Interpretation of Statutes, sec. 527. I am not aware of any reason why similar rules should not be applied to the construction of the provisions of the charter of the city of St. Louis. 100 Ill. 495. I recognize the fact that the construction of constitutions adopted and acted upon by the Legislature and the executive officers is not conclusive upon the courts, but where the meaning of a constitutional or charter provision is subject to a reasonable doubt, usage or legislative practice has been largely followed by the courts. Endlich on the Interpretation of Statutes, sec. 528; 46 Mich. 565. The whole instrument, all preceding charters, the general legislation of the State, and the object of the Legislature, in the creation of municipalities, should be consulted in construing particular provisions of charters. 147 Mo. 259; 140 Mo. 458; 25 Misc. (N. Y.) 683; 25 Misc. (N. Y.) 215; 34 App. Div. (N. Y.) 152. (4) The defendant in this case should be estopped from setting up the illegality of the ordinance as a defense to the prosecution. 25

Tex. App. 515. The charter in defining the powers of the Municipal Assembly to enact ordinances (sec. 6, p. 217), uses this language: "To prevent the introduction and spread of contagious diseases, to establish and regulate hospitals and to secure the general health of the inhabitants by any measure necessary." And again, under the general-welfare clause (sec. 14) the following language is used: "To pass all ordinances, not inconsistent with the charter or the law of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city." This broad and liberal provision in the charter of the city of St. Louis would clearly confer on the Municipal Assembly the authority to enact an ordinance authorizing the Board of Health to contract for the removal of garbage from the streets and alleys and elsewhere in the city. (5) The offering of money to an officer to influence his official action, is, under our laws, bribery, just as much as paying the money would be. If Chapman, under the charter and the ordinances as passed, as a member of the Board of Health had offered to receive or received money to influence his official action he would have been guilty of bribery, without regard to whether the ordinance authorizing the letting of the garbage contract had emanated from the Board of Public Improvements, or from the City Council, because one who undertakes to exercise and does exercise the duties of an officer and receives the emoluments thereof, though his title is defeasible, is liable for malfeasance and is guilty of bribery if he accepts money to influence his official action. 118 N. C. 1206; 49 Ala. 323. When one assuming to act as an officer is called to answer for malfeasance, he can not be permitted to assail the validity of his appointment or election. He is estopped from abrogating his official capacity. 49 Ala. 322; State v. McIntire, 3 Ired. 174. State v. Williams, 136 Mo. 307, clearly holds that where one is charged with bribery of an officer, he can not raise the

question of the title to the office, or the power to act of
the one whom he attempts to bribe, in order to defeat
the prosecution or invalidate the indictment.   The com-
pany of the defendant, having contracted with the
Board of Health, should not be heard to say that the
Board of Public Health did not have authority to make
the contract, when defendant is charged with the com-
mission of the crime of bribery in attempting to in-
fluence the action of a member of said board by offering
him money to act with partiality and corruptly in
awarding the contract for the removal of garbage.   96
Ind. 369.   Evidence of similar offers are admissible.
The rule is that where a person's intentions are in
issue, acts of a similar character are admissible.   Whar-
ton's Criminal Evidence (9 Ed.), sec. 46; 9 Conn. 47;
37 N. H. 196; 126 Mass. 46; 4 Parker's Cr. Rep. 71;
99 Pa. St. 388; 17 Ala. 618; 7 Tex. App. 5.

*Jos. W. Folk,* circuit attorney, also for the State.

(1)   The ordinance providing for the letting of the
garbage contract by the Board of Health is valid.   (a)
Section 27, article 6, of the charter applies only to the
public work over which one of the six departments com-
posing the Board of Public Improvements has juris-
diction.   Sec. 27, art. 6, chapter; Secs. 3 and 4, art. 4,
charter; Secs. 35 to 40, inclusive, art. 4.   (b)   The re-
duction of garbage is not a public work of a construc-
tive nature susceptible of "improvement or repair"
contemplated by section 27, article 6, of the charter.
State ex rel. v. City, 169 Mo. 31.   (c)   The sanitary re-
duction of garbage is a health measure to prevent in-
jury to the public health.   For the purpose of protect-
ing the public health a Board of Health is established
by article 12 of the charter.   (d)   The power of the
Municipal Assembly to enact ordinance 20476 is given
in section 26, article 3, clause 6, which provides that the
Municipal Assembly may enact laws to prevent the in-

troduction and spread of contagious diseases; to establish and regulate hospitals and to secure the general health of the inhabitants by any measure necessary. The power is also given to the Municipal Assembly by the general-welfare clause, subsection 14 of section 26, article 3, to pass all ordinances not inconsistent with the charter or the law of the State, as may be expedient in maintaining the peace, good government, health and welfare of the city. Likewise, article 3, section 26, authorizes the mayor and assembly, by ordinance, to establish a sanitary system. (e) Section 27, article 6 of the charter does not convey the sole power of contracting for the city to the Board of Public Improvements. It applies only to the public work peculiarly concerning the streets, waterworks, sewers, harbors and wharves or parks, the commissioners of which constitute the Board of Public Improvements. (f) Section 7, article 16, clearly shows that the Board of Public Improvements are not the only officers authorized to contract for the city. This section says that where no other officer or agent is authorized to contract for the city by existing law or ordinance, the same shall be made by the comptroller. (g) State ex rel. v. City, 161 Mo. 371, has no application to this case, that being a case of a contract for improving or cleaning the streets, and therefore coming under the jurisdiction of the street commissioner and the Board of Public Improvements. Sec. 17, art. 6, charter. (h) In determining whether an ordinance is contrary to a charter, the courts take the same position as in cases where a statute is claimed to be contrary to the Constitution. They lean toward a construction which favors and upholds the validity of the ordinance. Verdin v. City, 131 Mo. 26. (2) Even if in a proper proceeding, ordinance 20476 might be held invalid, the defendant can not excuse himself thereby for attempting to influence the official conduct of one of the members, for the members of the Board of Health at least had the *de facto* power to let the con-

tract.   State v. Graham, 96 Mo. 120; State v. Ellis, 33
N. J. L. 103; Newman v; People, 23 Col. 300; Florey
v. State, 11 Tex. App. 103; Grover v. State, 109 Ind.
391; State v. Gardner, 54 Ohio St. 24; In re Bozeman,
42 Kan. 451; State v. Potts, 78 Ia. 658; State v. Carroll,
38 Conn. 449; State v. Gardiner, 42 N. E. 999.   (a) The
constitutionality of the ordinance can not be attacked
collaterally.   State v. Rich, 20 Mo. 393; State v. York,
22 Mo. 462; State v. Wiley, 109 Mo. 443.   (b) An offi-
cer *de facto* may be bribed as well as an officer *de jure.*
One is an officer *de facto* who usurps an office to which
he has no right, or holds by authority of an unconstitu-
tional statute.   Van Vleet on Collateral Attacks, p. 51;
State v. Carroll, 39 Conn. 449; Smith v. Lynch, 29 Ohio
St. 261.   (3) The evidence of Dr. Merrill as to a simi-
lar attempt made to bribe him by the defendant in the
same matter, at or near the same time as the attempted
bribery of Dr. Chapman, was competent as showing
that the intent of defendant in offering money to Dr.
Chapman was to bribe.   State v. Balch, 136 Mo. 103;
State v. Goetz, 34 Mo. 34; State v. Wilson, 143 Mo. 103;
State v. Truley, 142 Mo. 403; State v. Meyers, 82 Mo.
558; Higgins v. State, 157 Ind. 57; Guthrie v. State, 16
Neb. 667; State v. Williams, 136 Mo. 293.   (4) The
point made by the defense that the offer of bribe was
made on September 16, 1901, and the ordinance was
not signed by the mayor until September 17, 1901, and
therefore there can be no bribery, is untenable.   In the
first place Dr. Chapman said the date of the offer by
the defendant was on or about the 16th of Septem-
ber.   It further appears definitely that at the time of
the attempted bribery the ordinance had passed.   The
ordinance was signed by the speaker of the House on
September 11, 1901, and by the president of the Council
on September 13th.   Supposing, for the sake of argu-
ment, that the attempt was made on September 16th,
after the ordinance was passed, but before it was signed
by the mayor, it was just as much attempted bribery as

if the offer had been made on September 26th, for it was an attempt to influence by money, the official conduct of Dr. Chapman on a matter that might by law, come before him.

FOX, J.—The indictment in this cause was filed in the circuit court of the city of St. Louis on April 5, 1902. Judge O'Neill Ryan granted the defendant a change of venue from the Eighth Judicial Circuit, and transferred the case to the circuit court of Boone county, where it came on for trial on November 10, 1902.

The indictment charged the defendant with attempting to bribe Dr. Henry N. Chapman, a member of the Board of Health of St. Louis, by offering him $2,500 if he would vote, as a member of said board, to accept the bid of the St. Louis Sanitary Company for the reduction of the garbage of the city.

Omitting caption, the indictment is as follows:

"The grand jurors of the State of Missouri, within and for the city of St. Louis, now here in court duly impaneled, sworn and charged, upon their oath present: that on (or about) the twenty-ninth day of September in the year one thousand nine hundred and one the city of St. Louis aforesaid was a municipal corporation of and in the said State of Missouri. That by the provisions of its charter the legislative power of said city was vested in a Council and a House of Delegates, styled the Municipal Assembly of the city of St. Louis, and that every ordinance passed by a majority vote of the members of said Council and said house of delegates (respectively), and approved by the mayor of said city, became and was an ordinance and law of said city ten days after said approval, unless an emergency was declared to exist by a two-thirds vote of the members of said Council and House of Delegates (respectively), in which event such ordinance became and was a law of said city from and after the date of such approval by said Mayor. That on the day and year afore-

said there was an ordinance and law of said city which had been theretofore duly passed by a majority vote of the members of said Council and of said House of Delegates respectively (so constituting the Municipal Assembly of said city as aforesaid), known and designated as city ordinance number 20476, entitled 'An ordinance for the protection and preservation of the public health by providing for the sanitary removal of all slops, offal, garbage, vegetable matter and animal matter of the city of St. Louis, by a process known as the Merz process, wherein it was ordained by the said Municipal Assembly of said city (among other things) that the Board of Health of said city was thereby authorized and directed by a vote of a majority of its members to provide for and enter into a contract for the sanitary disposal of all slops, offal, garbage, vegetable matter and animal matter of the said city by the Merz process; that said contract should be let within fifteen days from the approval of said ordinance; that within fifteen days from the approval of said ordinance the said Board of Health should (under the supervision of the register of said city) cause to be inserted for five days, in the newspapers doing the city printing, an advertisement asking for sealed proposals for the disposal of all slops, offal, garbage, vegetable matter and animal matter of said city by the Merz process (in accordance with the provisions of said ordinance); that the contract aforesaid should be awarded by the said Board of Health to the best bidder therefor, and that the said Board of Health should have the right to reject any and all bids. That in the body of said ordinance an emergency was expressed and declared to exist, and that the said Municipal Assembly, by a vote of two-thirds of all the members elected to each house thereof, directed that said ordinance should take effect and be in force from and after its approval by the mayor of said city on the 17th day of September, A. D. 1901, and that said ordinance then and thereafter (under the provisions of the

charter of said city as aforesaid) became and was a law of said city of St. Louis. That by the provisions of the charter of said city, there had been created and was existing at the time of the passage and approval of the said ordinance and thereafter, a Board of Health of said city of St. Louis, consisting of the mayor aforesaid, the presiding officer of the aforesaid Council, a commissioner of police of said city, an officer denominated the health commissioner, and two regular practicing physicians; and it was provided by ordinance of said city that the two regular practicing physicians aforesaid should be appointed by the mayor of said city and such appointment confirmed by a two-thirds vote of the Council aforesaid. That pursuant to the provisions of the ordinance and law aforesaid, numbered 20476, and approved September 17, A. D. 1901, and within fifteen days after the approval of the said ordinance as aforesaid, to-wit, on the 23d day of September, A. D. 1901, the said Board of Health did (under the supervision of the register of said city) cause to be inserted for five days, in the newspapers doing the city printing, an advertisement asking for sealed proposals for the disposal of all slops, offal, garbage, vegetable matter and animal matter of said city by the Merz process (in accordance with the provisions of said ordinance and law), and setting forth that such sealed proposals would be received at the office of said Board of Health in said city on Tuesday, the first day of October, A. D. 1901, at four o'clock in the afternoon of that day, at which time such sealed proposals would be publicly opened and read. That at the time of the passage and approval of the said ordinance numbered 20476, and for a long time prior thereto, and thereafter at the said city of St. Louis, one Henry M. Chapman was a regular practicing physician and a member of the Board of Health aforesaid, duly appointed, confirmed and qualified, and was then and there a public officer of the said city of St. Louis; that under the provisions of the aforesaid ordinance and law

of said city, numbered 20476, the said Henry M. Chapman, as a member of said Board of Health and in his official capacity and character as such member, was authorized, empowered, directed and required to give his vote, opinion, judgment and decision upon any question, matter and proceeding which might by law (and under the provisions of the said ordinance) be brought before the said Board of Health, and before him, the said Henry M. Chapman in his said official capacity and character as a member of said Board of Health, and particularly upon the question, matter and proceeding of examining and considering such sealed proposals as might under said ordinances and law be made and submitted to said Board of Health for the sanitary disposal of all slops, offal, garbage, vegetable matter and animal matter of said city by the Merz process, and to give his said vote, opinion, judgment and decision in the premises either to award the contract provided for by the said ordinance and law to the best bidder therefor or to reject any and all bids therefor, as aforesaid. That at the said city of St. Louis, and on (or about) the twenty-ninth day of September in the year one thousand nine hundred and one aforesaid, one Edward Butler, well knowing the premises, and then and there well knowing that the said Henry M. Chapman was then and there a member of the said Board of Health and a public officer as aforesaid, and then and there unlawfully, corruptly and feloniously devising, contriving and intending to corruptly influence the vote, opinion, judgment and decision of the said Henry M. Chapman (in his said official capacity and character as a member of the said Board of Health and as a public officer as aforesaid) upon a question, matter, cause, and proceeding which might by law be brought before him, the said Henry M. Chapman, in his official capacity and character as aforesaid, did then and there unlawfully, corruptly and feloniously offer and attempt to bribe him, the said

Henry M. Chapman, public officer as aforesaid; and in such offer and attempt to bribe, he, the said Edward Butler (then and there well knowing the premises as aforesaid, and then and there well knowing that the said Henry M. Chapman was then and there a member of the said Board of Health and a public officer as aforesaid), did then and there unlawfully, corruptly and feloniously propose and offer to give him, the said Henry M. Chapman, public officer as aforesaid, a large sum of money, to-wit, the sum of twenty-five hundred dollars, as a bribe and inducement to him, the said Henry M. Chapman, public officer as aforesaid, that he, the said Henry M. Chapman, in his official capacity and character as a member of the said Board of Health, as aforesaid, should and would give his vote, opinion, judgment and decision in favor of awarding the contract provided for in the said ordinance and law numbered 20476, to the St. Louis Sanitary Company (a corporation), which said St. Louis Sanitary Company (a corporation) as aforesaid, was then and there (as averred by him, the said Edward Butler) about to make, deliver and submit to the said Board of Health a sealed proposal and bid for the sanitary disposal of all slops, garbage, vegetable matter and animal matter of said city of St. Louis by the Merz process (in accordance with the provisions of the ordinance aforesaid), pursuant to the advertisement aforesaid; contrary to the form of the statute in such case made and provided and against the peace and dignity of the State.''

Upon the trial of this cause, the testimony directly applicable to the charge in the indictment, was substantially as follows:

The St. Louis Sanitary Company had the contract for the reduction of the garbage of the city. This contract expired in November, 1901. At the time the defendant saw Dr. Chapman the Sanitary Company was seeking to secure the new contract to be let upon the expiration of the old. The Sanitary Company received

some $65,000 a year for garbage reduction under the old contract. The Excelsior Company had the contract from the city for hauling the garbage to the reduction works. The defendant, Edward Butler, was the owner of 185 shares of stock in the St. Louis Sanitary Company, and was largely interested in the Excelsior Hauling Company, and materially represented it. The St. Louis Sanitary Company paid the defendant Butler a salary of $2,500 a year in order to promote ''good feeling between the Hauling Company and the Sanitary Company.'' On September 30, 1901, the St. Louis Sanitary Company made a contract with the Excelsior Hauling Company whereby the Sanitary Company agreed if it secured the contract from the city for the reduction of garbage, after the expiration of the contracts it then held, the Sanitary Company would pay the Excelsior Hauling Company $45,000 in cash, and the further sum of $17,000 a year for each of the three years to be covered by said contract.

On July 30, 1901, there was introduced in the Council of the city of St. Louis, an ordinance providing for the protection and preservation of the public health, by providing for the sanitary disposal of all slops, offal, vegetable and animal matter of the city of St. Louis, by a process known as the Merz process, and authorizing the Board of Health to advertise for bids for the sanitary reduction of garbage, and award the contract to the best bidder. This ordinance was passed and signed by the president of the Council on September 11, 1901, and signed by the speaker of the House of Delegates on September 13, 1901. The emergency clause was passed by the necessary vote to have the ordinance go into effect at once.

On September 17, 1901, the mayor reported to the Council that he had signed the ordinance. The Board of Health thus authorized to let the contract for the sanitary reduction of garbage was composed of Dr. M. C. Starkloff, Dr. Albert Merrill, Dr. H. M. Chapman,

Mr. Andrew Blong, Hon. Joseph Hornsby, president of the City Council, and Hon. Rolla Wells, the Mayor of the city.

Dr. Henry N. Chapman testified in respect to the attempted bribe, as follows:

"Q. Do you know the defendant, Edward Butler? A. Yes, sir.

"Q. I will ask you whether or not you saw the defendant, Edward Butler, on or about the sixteenth or seventeenth of September, 1901? A. I did.

"Q. If so, where did you see him? A. I saw him at that time in my office.

"Q. In your office at your house? A. At my house, yes, sir; the only office I have.

"Q. What time of day was it when he came there? A. It was twilight, just in the evening, probably six or seven o'clock.

"Q. Will you state, Doctor, all that passed between you and the defendant on that occasion; what he said and what you said? A. Mr. Butler was in the front room of my place, the front office, when I was sent in. I did not open the door; he came in; some one let him in, and I followed into the room after him. We shook hands, and he began to speak about the garbage reduction works in South St. Louis, telling me what a very fine place it was, all of which I appreciated, for I had seen it, and he told me of the great expense that the Sanitary Company had been put to in fitting up these works, and how it was the most complete works in the United States, and how perfectly they were ready to take and handle any amount of garbage, and he then went on to speak of the ordinance that had been passed for a new garbage contract. He said, 'Our company intends to put in a bid, and we would like to get it,' he said. 'In fact we think it is due us. We have worked there for ten years and made no money, and the city rather owes it to us to throw it our way if possible.' I said to him that if there was more than one bid the Board of Health

would be compelled to give it to the lowest bidder, and that if he was the lowest bidder, if his bid was the lowest, of course he would get it. He then went on to speak of the terms of the ordinance, and he said: 'You know, Doctor, that in the ordinance it calls for a $50,-000 cash bond to be put up by the bidder who is successful in receiving the bid. You know,' he said, 'this $50,000 is intended to cover the faithful completion of the works,' he said. 'You know we have the complete works down there and therefore this cash bond will not have to stay up very long, and at the time this comes down and the Board of Health signs the release and takes it down I would like to come to you, Doctor, and make you a present of twenty-five hundred dollars if you will vote for our company to get this contract.' I said, 'Mr. Butler, I can't do that. It would not be money that I could take and spend with any satisfaction to myself, and I can't do it.' He then said, 'Well, Doctor, I will see you again,' and shook hands with me and left the house.

"Q. That was about what day? A. I would fix that date around about the 16th of September, 1901.

"Q. When did you next see the defendant? A. I didn't see him again until around about the first of November of the same year.

"Q. Where did you see him then? A. In the same room; in the same place.

"Q. Describe how he came in, what he did, what he said, and what you said to him? A. It occurred in the same room in which the previous interview occurred. When I went into the room Mr. Butler was standing in a dim light. There was no light in the house, but in front of my house is a gas lamp which reflects distinctly into the office and shows up fairly a good deal of light, plenty of light, enough to recognize people in the room. When I stepped in he was standing close to the folding door that separated the two rooms. I walked up and says, 'Good evening, Mr. But-

ler.' He responded, and then peered about the room, and says to me: 'Doctor, I am a man of my word, and I am here,' and he held towards me a roll of money. I said, 'Mr. Butler, I thought I made it plain to you that I would not take that money.' He said, 'Well, Doctor, you are not a millionaire,' and I says, 'No, I am not a millionaire, and further than that, I could use and place every penny of the money you are offering to me, but I won't take it, and I can't use it.' He then appeared to get somewhat excited, and said, 'Well, Doctor, you are one man in a million,' and he turned and said, 'I hope you won't hold it against me.' I said, 'No, Mr. Butler, I suppose according to your lights it is right, but according to my lights it is wrong.' He said, 'If I can ever do anything for you, call on me,' and he said, 'Good-evening,' and stepped out.

"Q. How are you able to state the 16th of September as the date upon which this first interview occurred? A. I don't quite know how far I can proceed in answering that.

"Q. Well, proceed as far as you can, and we will determine how successful you have been. A. On September 22d the wife of a very dear friend of mine returned from Europe to St. Louis, Mrs. Bell. I had told her husband—I had told her husband previous to her returning. The date of telling her husband was on Monday, and if I recollect it properly, the Monday preceding her return to St. Louis was the 16th of September.

"Q. You then fix the 16th of September by reason of your having told some one of this occurrence between the defendant and yourself? A. Yes, sir.

"Q. Now, when was it that you told this person of the occurrence? A. I told him definitely on the Monday preceding the return of his wife from Europe.

"Q. His wife returned on the 22d? A. Yes, sir.

"Q. And you told your friend definitely on the Monday before her return? A. Yes, sir.

"Q. Do you know what day of the week the 22d of last year was? A. My recollection was it was Sunday.

"Q. Then according to that the 16th would be on Monday? A. That is my recollection of it.

"Q. So that you are quite positive, are you not, that this occurrence took place on the 16th of September? You haven't very much doubt about that, have you? A. Not very much doubt about that; it was on or about the 16th.

"Q. Yes; you are quite positive that it was on the 16th? A. On or about the 16th.

"Q. Very well. You have said that you told your friend, whose wife returned on the 22d, of this occurrence on the Monday before her return. Do I understand that to be the same date on which you had this interview with Mr. Butler? A. I state that the interview with Mr. Butler was on or about the 16th, and I definitely told him about it on the 16th. That is what I stated.

"Q. You told your friend then? A. Yes, sir.

"Q. Then it must have occurred before you told your friend? A. It must have, yes, sir.

"Q. If it occurred on the 16th, then you told your friend on the same day that it occurred, of course at a later hour than this occurrence. It occurred about dark, didn't it? A. Along about dusk.

"Q. So you told your friend during the evening of the 16th? A. Yes, sir.

"Q. You say here positively that you told your friend of this occurrence as early as the 16th of September, don't you? A. Yes, sir.

"Q. Therefore your interview with Mr. Butler must have occurred before you told your friend? A. Yes, sir."

The wife, servant and cook of Dr. Chapman testified to defendant's visits to the house of the Doctor.

Dr. Albert Merrill, also a member of the Board of Health, over the objections of defendant, testified that the defendant approached him and said, "When the contract is approved and becomes a law, I will make you a present of twenty-four hundred dollars." It further appears from this doctor's testimony that the defendant visited him twice. The second time, he says, the defendant had in his hand what appeared to be a quantity of gold coin and bills. As to these visits, as testified by Dr. Merrill, no precise date was fixed. One of them was fixed at about the 29th of September.

On the part of the defendant, the testimony tended to show that the St. Louis Sanitary Company was the only corporation or individual possessing a plant in the city of St. Louis that could do the work required by the ordinance. It tended to show that it was a physical impossibility for another plant to be constructed within the time required. It was claimed for the defendant that there was no occasion for him to offer a bribe to the members of the Board of Health, as the contract necessarily would have to be let to the St. Louis Sanitary Company.

Defendant testified in his own behalf. He unqualifiedly denied visiting Dr. Chapman during the month of September, 1901, as was detailed by the Doctor? He further states that he was ill nearly all the month of September and unable to leave the house.

James J. Butler and Edward Butler, Jr., testified substantially that their father, the defendant in this cause, was, on the 16th of September, 1901, confined to his room by sickness. It is also disclosed by the record that witness Dr. Chapman, to whom it is charged the bribe was offered, did not disclose what had transpired between the defendant and himself, to the Board of Health, the circuit attorney or his assistants, or to any one else, who would probably undertake to have the defendant prosecuted for the offense of attempted bribery, until some time in the winter or spring, when

he was called before the grand jury and related the conversation with the defendant.

This is a sufficient recitation of the facts to determine the legal propositions involved.

At the close of the evidence, the court instructed the jury, and the cause was submitted to them for their consideration. It will answer no needful purpose to burden this opinion by inserting the instructions. Such of them as demand discussion will be noted during the progress of the opinion.

The jury returned a verdict of guilty, and assessed defendant's punishment at three years' imprisonment in the penitentiary.

In proper time, motions for new trial and in arrest of judgment were filed, which were by the court overruled, and the defendant, in due form, prosecuted his appeal, and this cause is now before us for review.

This is a criminal charge for attempted bribery. The indictment is predicated upon sections 2084 and 2089, Revised Statutes 1899. The former section defines the completed offense, and the latter has application to an attempt to commit the offense, as defined by the former. As applicable to this case, the offense may be defined as follows: "Every person, who shall directly or indirectly [offer to] . . . give any money . . . to any . . . public officer of this State or, . . . city thereof . . . with intent to influence his vote, opinion, judgment or decision on any question, which . . . may by law be brought before him in his official capacity," shall be guilty of an attempt to bribe.

The elements of the offense, as denounced by this statute, are: First. There must be a public officer of the State or city thereof. Second. The offer must be made with intent to influence the vote, opinion, judgment or decision of such public officer. Third. The vote, opinion, judgment or decision must be in respect to some *question* which may by *law* be brought before the

public officer, in his official capacity.  To constitute this offense, all the elements, herein noted, must be shown to exist, and the absence of any one of them would be fatal to this charge, because not within the terms of the statute defining the offense.

The most vital question presented in this cause for consideration, is involved in the first contention of appellant, that there was no law in force at the time of the alleged attempted bribery, in respect to a subject-matter, which imposed the burden of any action, vote, opinion, judgment or decision on the public officer. This contention is predicated upon two theories.  First, that under the provisions of the charter of the city of St. Louis, there was no authority in the Assembly to adopt the ordinance introduced in evidence, authorizing the Board of Health to let the contract for the sanitary disposal of garbage, collected from the public streets and alleys of the city, and from private premises.  Second, that the testimony failed to show, that at the date of the alleged attempted bribery, the ordinance authorizing the letting of the contract for the removal of the garbage, had been approved and signed by the Mayor; and for that reason, there was no ordinance in existence at the time the alleged offer was made.  These are the propositions confronting us.  This case should not and will not be made an exception; the rules of law should not be relaxed to reverse it, nor should they be extended to affirm it.  The law must be universal in its application, and as applicable to this case, fairly and reasonably interpreted, must at last be the solution of the questions involved.

Ordinance 20476, introduced in evidence, so far as pertinent to the discussion of the questions presented, provides as follows:

"Section 1.  The words 'slops, offal, garbage, vegetable matter and animal matter' referred to in this ordinance, shall be construed to mean the refuse matter from kitchens, pantries, dining rooms and other parts

of hotels, restaurants, boarding houses, tenement houses, dwelling houses, the public institutions belonging to the city of St. Louis, market houses, private hospitals and club houses, the animal refuse from slaughter houses, the refuse garbage and animal matter from butcher shops and meat shops and vegetable stands, the refuse, fruit and vegetables from stores and commission houses, the refuse animal matter from poultry stores, the refuse animal and vegetable matter from grocery stores, the refuse from fish stores, all dead animals, including dogs, cats, goats, sheep, fowls, horses, mules, steers, cows and bulls that may be collected from the streets, alleys, parks or from private premises in the city of St. Louis.

"Section 2. The Board of Health of the city of Saint Louis is hereby authorized and directed, by a vote of a majority of its members to provide for and enter into a contract for the sanitary disposal of all slops, offal, garbage, vegetable matter and animal matter of the city of St. Louis by the Merz process."

The other provisions of the ordinance relate to the details of the contract, its nature, duration, etc., etc., which are not essential to the determination of the questions before us, hence there is no necessity for burdening this opinion with them.

The charter of the city created the Municipal Assembly, and all the powers of such assembly must emanate from the charter; it is the origin of all the powers vested in the Assembly, and every act of the legislative department of the city government must find support for the acts performed by the express or implied powers granted the municipality in its charter.

The power of the Board of Health to contract for the disposal of garbage collected from the various places in the city, must find support in the grant of such powers by the charter, and if such power is not granted by the charter of the city, then we take it that the proposition is too plain for discussion, that an ordinance by

the Assembly authorizing the exercise of such power by the Board of Health, would be absolutely without any legal force or effect.

The powers granted in the charter upon which counsel for the State insist that this ordinance is properly predicated, are contained in the following provisions of the charter:

Section 26, clause 6, provides: "To establish and enforce quarantine laws and regulations; to prevent the introduction and spread of contagious diseases; to establish and regulate hospitals, and to secure the general health of the inhabitants by any measure necessary."

The general-welfare clause of section 26 provides: "Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures, and to enforce the same by fines and penalties, not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars."

Clause 2 of section 26 provides that the Municipal Assembly shall have the power by ordinance, "to establish and maintain a sanitary system, a system of police and a fire department."

Appellant challenges the power to authorize the Board of Health to contract for the disposal of the garbage, under the foregoing provisions of the charter. This contention is based upon section 27 of article 6 of the charter, which provides: "The Assembly shall have no power directly to contract for any *public work* or improvement, or repairs thereof, contemplated by this charter, or to fix the price or rate therefor; but in all cases except in case of emergency work or necessary repairs requiring prompt attention, the Board of Public Improvements shall prepare and submit to the Assembly an ordinance, with an estimate of the cost indorsed

thereon by the president of the board, authorizing the doing of any proposed work, and, under the direction of the ordinance authorizing the same, shall advertise for bids, in the papers doing the city printing, three times, the last publication to be at least ten days before the day appointed for the opening of the bids, stating the general nature of the work to be done and the time and place when the bids will be received, and shall let out said work by contract to the lowest responsible bidder.''

This provision is emphasized by the positive and emphatic declaration: *''Any other mode of letting out or contracting* for work shall be held as illegal and void.''

It is apparent that these two conflicting contentions in respect to the powers granted by the provisions of the charter herein quoted, sharply present the question as to the proper interpretation of the charter provisions.

The garbage, designated in this cause, to be disposed of by the city, includes that collected from the public streets, alleys and similar places, as well as from private premises. There is no dispute that the removal and disposition of it is paid for out of the city treasury, and the question upon this particular contention is narrowed down to the application of the terms *public work,* as used in section 27 of article 6 of the charter. If the terms *public work* as used in section 27 of the charter are applicable to the *work* of removing garbage, then, if the provisions of section 27 of article 6 of the charter mean anything, there can be but one conclusion reached, and that is, that the Municipal Assembly is absolutely prohibited from authorizing the Board of Health to contract for the removal and disposal of such garbage.

If the removal and disposal of garbage is a class of *public work* contemplated by section 27, supra, it follows that as to that work, there is an express provision in the charter, as to where the power is vested to con-

tract for the performance of it, and the manner of letting the contract.

It will be observed that the provisions of the charter to which our attention has been invited by counsel for the State in section 26 of article 3, only confers the power, if at all, by implication, to authorize the making of this contract by the Board of Health. The law is well settled and clearly stated by Judge DILLON in his work on Municipal Corporations, that where the charter expressly provides how the act shall be performed, a general provision which only confers the power by implication, can not abrogate the limitations contained in the special provisions applicable to the method of performing the act. In treating of this subject, Judge DILLON says:

"Municipal charters, or incorporating acts, are sometimes silent as to the power to pass by-laws or ordinances; and where this is the case, the municipal body has the power, incidental to all corporations, to enact appropriate by-laws. Occasionally, the charter or incorporating act, without any specific enumeration of the purposes for which by-laws may be made, contains a general and comprehensive grant of power to pass all such as may seem necessary to the well being and good order of the place. More frequently, however, the charter or incorporating act authorizes the enactment of by-laws in certain specified cases, and for certain purposes; and after this specific enumeration a general provision is added, that the corporation may make any other by-laws or regulations necessary to its welfare, good order, etc., not inconsistent with the Constitution or laws of the State. This difference is essential to be observed, for the power which the corporation would possess under what may, for convenience, be termed 'the general-welfare clause,' if it stood alone, may be limited, qualified, or, when such intent is manifest, impliedly taken away by provisions specifying the particular purposes for which by-laws may be made. It is clear that the

general clause can confer no authority to abrogate the limitations contained in special provisions. When there are both special and general provisions, the power to pass by-laws under the special or express grant can only be exercised in the cases and to the extent, as respects those matters, allowed by the charter or incorporating act; and the power to pass by-laws under the general clause does not enlarge or annul the power conferred by the special provisions in relation to their various subject-matters." [Dill. Mun. Corp. (4 Ed.), pp. 392 and 393.]

There is only one way to settle this question; that is to apply the reasonable and ordinary rules of interpretation to charter provisions of this character. In doing this, we should seek to give force and effect to the intention and purposes sought by the framers of the instrument, and in this connection it will not be inappropriate to refer briefly to its history in respect to public works.

The Board of Health of the city of St. Louis is composed of the mayor, the president of the Council, a commissioner of the Board of Police Commissioners, designated by the mayor, two regular practicing physicians appointed by the mayor, and the health commissioner. This board is called the Health Department of the city. The chief duties and powers are devolved upon the health commissioner, and in certain respects specified, he acts under the supervision or with the approval of the Board of Health. With the exception of the mayor and the president of the Council, who are elective, the members of the board are either appointed or designated by the mayor. The composition of the board embraces the executive of the city, the highest representative of the legislative branch of the city government, a representative of the police power of the State, two physicians, and the health commissioner, who is an administrative officer.

The health commissioner and the board together

have a general supervision over the health of the city; over the city's eleemosynary institutions, also over nuisances in the city. But while they can condemn a nuisance, if any public work is required in abating it, such work must be contracted for by the Board of Public Improvements. They deal primarily and almost exclusively with questions of health and hygiene.

The Board of Public Improvements is composed of a president, who is elective, and the five commissioners, who are the heads of the five principal administrative departments of the city, and who are appointed by the mayor; and are known as the street commissioner, the water commissioner, the harbor and wharf commissioner, the sewer commissioner and the park commissioner. The president of the board has a supervising control over all the other commissioners.

Prior to the adoption of the present charter of the city, and under section 17 of article 5 of Revised Charter of the City of St. Louis of 1870, there was created the office of city engineer, and the duty of contracting for public work was cast upon him; after an experience of several years, the present system of contracting the public work was adopted, and the burden was changed from the city engineer to the Board of Public Improvements, by the enactment of section twenty-seven of article 6 of the city charter, in terms as broad as it was possible to make them. The adoption of this system seems to have been original with the framers of the charter, but the workings have proved so satisfactory, and the correction of so many evils that had formerly prevailed has been so satisfactory, that the system has been adopted by many other cities, including the charter of Greater New York.

The composition of the Board of Public Improvements includes persons who are elected or selected for their special fitness and skill; so that all public work for which the city is to pay out of its general revenue, or that is to be paid for by special taxbills, shall origi-

nate with, be under the direction and supervision of, and subject to, the control and judgment and experience and skill of the board.   Hence, the adoption of the system set forth in section 27 of article 6 of the charter, which, not only in the broadest,. but most emphatic and positive terms, prohibits the contracting of the public work by any board of persons other that the Board of Public Improvements; and then proceeds to detail the manner of letting the contract for such public work, and declares that it shall be let to the lowest responsible bidder; and then provides that any other mode of letting the contracts shall be illegal and void.

The purpose of all such provisions is not only apparent on their face, but it is a matter of common knowledge and municipal history, as written in the reports of. adjudicated cases.   It was to remove the evil of any one man, or set of men, letting contracts to favored individuals, at exorbitant prices, and to establish a system of checks and balances, whereby the city's and the citizen's interests should be safeguarded by vesting the power in the highest, most skilled and most representative officers in their line of the city.   In this way, no public work can be legally done without the knowledge of, first, the Board of Public Improvements; next, the Municipal Assembly; next, the mayor, and lastly, the taxpayers, who are notified by publication of the intention to let the contract for the work.

We are by no means unmindful of the importance of the functions of the Board of Health; their functions are of great importance, but they are not by any means as varied or extensive as those of the Board of Public Improvements.   As before stated, the members of the former deal primarily and almost exclusively with questions of health; the members of the latter  deal with the business of the city, its improvement, its development and its material necessities.

It is insisted by counsel for the State  that the dis-

posal of the garbage collected from the public streets, alleys and other designated places, is not the character of public work contemplated by section 27 of article 6 of the charter. If not, to what class of public work does it belong? To dispose of it requires work; it must be received at the plant, it must be handled and subjected to the action of machinery constructed for its disposal, all of which contemplates work. Is it public work? If not, what kind of work is it? The entire inhabitants of the city are interested in the work, which results in the sanitary disposal. It is paid for out of the general revenue of the city, gathered from its taxpaying citizens. The municipal authorities contract for the performance of it. It costs the city over a hundred thousand dollars annually to have it done. In point of cost, it approached very closely the most expensive of the designated departments over which the Board of Public Improvements has jurisdiction. If this is not *public work,* as contemplated by section 27, we confess the term *public work* is not susceptible of a definition. It is not only public work, but it is of the most important character; and requires for the protection of the city that the performance of it be under the supervision of the most skilled and experienced officers connected with the city government.

It is next insisted that this is not public work, for the reason that the contract is not for the building of the plant or works by which the garbage is disposed of. It is true the city does not pay for the machinery or plant which does the work; but it certainly will not be disputed that the city does pay for the work done through the operation of the machinery. The disposal of the garbage for the city, whether done by machinery, or hauling and dumping in the Mississippi river, is the performance of *public work.*

It is next urged that the removal and sanitary disposition of garbage constantly accumulating in a large and populous city, is a matter which clearly falls under

the jurisdiction of the health department. If that is true, it is strikingly singular that there is not an utterance or even an intimation, in a single provision under which it is claimed that this power was vested in the Board of Health, which authorizes it to contract for the performance of any character or species of public work. And it is apparent that the provisions of the charter herein quoted in respect to the prevention of the spread of contagious diseases and the establishment of a sanitary system, does not contemplate, nor did the framers of the charter entertain any such purpose, the exercise of the power to authorize the Board of Health to contract for the performance of public work. No doubt the Health Department is more capable than any other to determine what substances, if allowed to remain in the streets and alleys and on private premises, would be injurious to the public health. They may be entirely competent and efficient in that respect; but that furnishes no reason for disregarding the plain provisions of the charter, nor does it militate against the reasonableness of them, but it is the reverse. It is in strict accordance with the purpose and spirit of the framers of the charter, that where an immense debt was to be incurred by the city for the doing of work for the public, the responsibility for making the contract for such work should be placed upon that department of the city government that deals with the business interests of the city, and not specially with its health.

It is also argued that the reduction of the garbage of the city "is not a public work of a constructive nature susceptible of improvement or repair." Is there anything in the charter which indicates that the framers of it intended the use of the term "public work" to be restricted to work of a constructive nature? None that we can discover. It does appear from an examination of the charter, that the use of the term "public work" was intentional, and was used for the purpose of covering all classes of public work, not specially desig-

nated and covered by other provisions.     Unless the term was used for that purpose, it is clearly meaning-less and has no place in the charter.   As to the work of a constructive nature, to which it is contended this term is to be applied, it is fully and specially covered in other provisions of the charter.   Section 14 of article 6 covers the construction and reconstruction of streets.   Section 21 of the same article applies to sewers and the manner in which the contract for building them must be let. Section 29 of article 6 provides for contracts in relation to street sprinkling.   Section 3 of article 7 makes special provision concerning supplies for the waterworks.  Sec-tions 3 and 4 of article 7 pertain to the public parks. Section 2 of article 11, to the fire department.   Then section 27 of article 6 covers all public work.

We must keep in view the positive and broad lan-guage employed in section 27 of this charter:  "The Assembly shall have no power directly to contract for any *public work* or improvements or repairs."  It will be noted that the general term "public work" does not fol-low the terms "improvements or repairs," but precedes them, and is used independent of them; hence, the rec-ognized rule of construction which requires that "where a particular class is spoken of, and general words fol-low, the class first mentioned is to be taken as the most comprehensive, and the general words treated as refer-ring to matters *ejusdem generis* with such class," can not be invoked.   It is clearly indicated, by the use of the term *public work* in section 27, supra, the manner and place in which the term is used, that it was intended to cover all classes of public work not specially provided for in other parts of the charter.

In support of the proposition that the sanitary re-duction of garbage is not the character of public work contemplated by section 27, supra, the cases of State ex rel v. City of St. Louis, 169 Mo. 31, and Nebraska City v. Gas Co., 9 Neb. l. c. 348, are cited by counsel for the State.   An examination and analysis of these cases will

make it apparent that they have no application to this question, and by no means sustain the contention.

The first case cited, decided by this court, was a proceeding to restrain the treasurer of the city of St. Louis from paying certain money in conformity to an ordinance passed by the Municipal Assembly. Certain citizens on Flad avenue were in need of facilities for securing a supply of water. The city was not prepared to extend its system of waterworks and to lay the pipes on Flad avenue; but the water commissioner gave permission to the property-owners to lay such pipe. In pursuance of such consent, they did so. This work was not done by the city, but by private individuals. Subsequently the city wanted to include the pipes and appurtenances which belonged to the property-owners, in its system, and provided by ordinance, not for the doing of any public work, but for the purchase of the pipes and appurtenances on Flad avenue. The opinion of the court was clearly right, and it is apparent that no contract for public work was involved. BRACE, J., speaking for the court in that case, said: "The water-pipe and its appurtenances mentioned in the ordinance were laid in Flad avenue with the consent of the city, by the citizens named in the ordinance, and as appears from the evidence was of the value of $2,000. . . . Nor does this ordinance fall within the inhibitions of section 27, article 6, of the charter, as to contracts for any proposed public work or improvement or repairs to be thereafter done or made in pursuance of such contracts. This ordinance, regarded as a contract, is not for any public work or improvement or repairs to be done or made in pursuance thereof, but is simply a contract for the present purchase of existent property which the city needed as a part of its waterworks plant, and however dependent its power to make such a purchase in this manner may be on other provisions of the charter, it is not within the inhibitions of this section."

The Nebraska case has no application whatever to

the question before us. That simply involved a contract by which Nebraska City purchased from the Gas Light Company, its supply of gas for lighting purposes. The Gas Light Company was not doing any public work for the city of Nebraska; it was simply selling to the city the result of the work done for itself. This is made apparent from the opinion of the court. It said: "Only one point more is it necessary to notice. It is contended that before the city could have lawfully entered into this contract an estimate of the probable expense must have been made, as provided in section 32 of the act relating to the incorporation of cities of the second class. [Gen. Stat. 151.] But we think otherwise. This section has no application to contracts of this description, but to those respecting streets, bridges, or other work or improvement to be made for and owned by the city. Its language on this subject is: 'Before the city council shall make any contract for building bridges or sidewalks, or for any work on streets, or for any other work or improvements, an estimate of the cost thereof shall be made by the city engineer and submitted to the council, and no contract shall be entered into for any work or improvement for a price exceeding such estimate,' etc. Now, all that was contracted for here was the supplying the city with light, not for the erection of gasworks, to be owned and operated by the city. And the contract was made with the company, which had the exclusive right to that business within the city, the only source from which such light could have been obtained."

That is not this case; the city of St. Louis is not purchasing anything from the contractor who disposes of the garbage; nor does the city contract to erect the plant for the accomplishment of the work; but it is beyond dispute, that the city does contract for the reduction of the garbage; the city pays for it; somebody must do it; it does not reduce itself; it involves action and labor, and it is done for the city, and the entire people are interested in it, and it is public work beyond ques-

tion. So it is with the public work of the city in paving its streets; the material, such as brick, asphalt and the like, are prepared by machinery; the city does not pay for the construction of the machinery; but it does contract and pay for the public work done by the operation of it. The machinery is simply the instrument used by the contractor in the performance of the public work.

In the discussion of this case, we find that well-recognized and familiar rule invoked, as expressed by SHERWOOD, J., in his dissenting opinion in the case of Verdin v. City of St. Louis, 131 Mo. 1. c. 317 and 318. It is thus stated: "The universal rule is, that in construing statutes passed by the General Assembly of the State, the courts will lean toward a construction which favors and upholds their constitutionality, and it would seem that a similar favorable attitude should be assumed by the courts when construing municipal ordinances, because when speaking of cities, this court has well said: 'their charters are their constitutions, which authorize the councils to act, and a city council is "a miniature general assembly and their authorized ordinances have the force of laws passed by the legislature of the State."' "

It is insisted that under that rule, if there is a doubt as to the validity of the ordinance involved in this case, the doubt should be resolved in favor of upholding it. The rule announced is correct, but its application is erroneous. When the *charter* of a municipal corporation *authorizes* something to be done, and an ordinance undertakes to carry out such power granted in the charter, in such case the courts lean towards a construction of the ordinance which will uphold it. But that is not the question before us. Ordinance No. 20476, introduced in evidence, is not being construed; it needs no construction; it speaks for itself. The question is as to the power granted in the charter. The rule applies to authorized ordinances. If the power is contained in the charter of the city of St. Louis which would authorize

the passage of the ordinances, then there could be no question as to the validity of the ordinance; but that is not the point in judgment before us; the question here presented is not the construction of the ordinance, but it is the interpretation of the charter itself, and as to what power it possesses. The rule to be applied in determining the powers which may be exercised by municipal corporations, under their charters, is entirely different to the one invoked in this cause, as to the construction of an ordinance under an undisputed grant of power in the charter.

The question before us for consideration is the correct interpretation of the charter itself; is there anything in it which authorizes the municipality to exercise the power granted by this ordinance? The rule upon this subject has been very clearly and forcibly stated by the Supreme Court of Oregon, with citations of authorities to support it. Speaking through Chief Justice LORD, that court said:

"A municipal corporation, says Mr. Justice BRADLEY, is a subordinate branch of the domestic government of the State. It is instituted for public purposes only, and has none of the peculiar qualities and characteristics of a trading corporation, instituted for the purpose of private gain, except that of acting in a corporate capacity. Its objects, its responsibilities, and its powers are different. As a local governmental institution it exists for the benefit of the people within its corporate limits. The Legislature invests it with such powers as it deems adequate to the ends to be accomplished. [Mayor v. Ray, 19 Wall. 475.] But in construing the powers given to a municipal corporation by its charter, regard being had for the ends to be accomplished, the courts have inclined to adopt a strict rather than a liberal construction of such powers, thus applying substantially the same rule that is applied to charters of private incorporations. [Cooley on Constitutional Limitations, 195, and note.] They can exercise no

powers but such as are expressly conferred upon them by the act by which they are incorporated, or are necessary to carry into effect the powers thus conferred, or are essential to the manifest objects and purposes of the corporation. The rule is well expressed by Mr. Justice NELSON in the case of Minturn v. Laure, 23 How. 430, in the following language: 'It is a well-settled rule of construction of grants by the Legislature to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication, regard being had to the object of the grant. Any ambiguity or doubt arising out of the terms used by the Legislature, must be resolved in favor of the public. The principle has been so often applied in the construction of corporate powers, that we need not stop to refer to authorities.'" [City of Corvallis v. Carlile, 10 Ore. l. c. 140 and 141.]

Upon the same subject, Judge DILLON says: "It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the power expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensible. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." [Dillon on Mun. Corp. (4 Ed.), p. 145.]

This court has spoken in no doubtful terms as to the powers which can be exercised by municipal corporations. It said in City v. Eddy, 123 Mo. l. c. 557 and 558: "Now it is settled law that municipal corporations possess, and can only exercise such powers as are granted in express words or those necessarily incident to, or implied in the powers expressly granted. They are creatures of the law, established for special pur-

poses, and their corporate acts must not only be author-
ized by their charters, but those acts must be done by
such officers or agents, and in such manner as the char-
ter directs.''

Applying the undisputed rule as announced by
Judge Dillon and all the courts, in passing upon the
question of the powers which may be exercised by a
municipal corporation, we are forced to the conclusion
that if there is a fair, reasonable doubt concerning the
existence of the power in the charter, it will be resolved
against the corporation and the exercise of the power
denied.

We have carefully analyzed the provisions of this
charter and feel that no one can read it and escape the
conclusion that the framers of it intended, above every
thing else, to throw around the taxpaying citizens se-
cure safeguards against exorbitant prices for public
work. With this spirit in view, we are unable to recon-
cile it with the theory of the State's counsel, that the
term *public work,* in section 27, must be rejected as to
the disposal of garbage, and that in the making of one
of the most important contracts in the city government
we must look for its support from an implied power in
the general-welfare clause, or some other provision of
the city charter. If the power is to be exercised by im-
plication to make this contract, then all the safeguards
which are provided by section 27, in the interest of the
public, go for naught, and the Municipal Assembly may
pass an ordinance, under the general-welfare clause,
authorizing the making of this most important contract
for public work by such person and upon the terms as
in its wisdom it may see proper.

It may be said, and it is argued, that the construc-
tion given this charter by the departments of the city
government, and the long acquiescence in the construc-
tion so given, that the power was granted by the charter
to authorize the Board of Health to make this contract,
would justify the powers exercised in this case. The

recognition and acquiescence in an act of the Legislature or the provisions of a charter, for any length of time, can not have the effect to legalize it. Doubtless, many statutes can be recalled that have stood undisturbed for years, and were acted upon and acquiesced in by the public; but when at last the test of their legality was applied, they were declared inoperative and illegal.

This construction and acquiescence in a provision may be considered in reaching a conclusion as to the power granted, but the absence of power can never be supplied by construction or acquiescence.

Endlich on Interpretation of Statutes (sec. 528), makes this clear. He says: "Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly expressed their will in the constitution and appointed judicial tribunals to enforce it."

Construction and acquiescence by the entire city government as to the application of terms used in a provision of the charter, while it is entitled to respectful consideration, should not be permitted to nullify the plain and unambiguous terms of section 27, which expressly provides how all *public work* shall be contracted. It was very appropriately said by Mr. Justice TRUNKEY of the Supreme Court of Pennsylvania: "Neither the debates, nor supposed views of the people, nor the dictum of this court, nor all combined, can set aside the plain meaning of a constitutional provision; but if the sense of a clause be doubtful, the contemporaneous understanding is material." [Pike Co. v. Rowland, 94 Pa. St. 1. c. 249.]

Whenever this court has been called upon to construe the provisions of the charter in respect to contracts for *public work,* it is very clearly indicated that "public work," in keeping with the spirit of the charter, is to be given its broadest signification.

The case of State ex rel. v. Barlow, 48 Mo. 17, is very correctly interpreted in the argument of Judge

WILLIAMS, of counsel for appellant, where he says: "This court, in State ex rel. v. Barlow, construed the amended charter of St. Louis of 1870. That charter provided for the letting of public work by the city engineer. The question before the court was whether a contract for repairing, cleaning and lighting the street lamps was within the terms of that section of the charter. It was claimed by the relator that the charter had no application to the work of that character, since it required the engineer to submit 'plans, profiles and estimates of costs,' and that these terms, as to plans and profiles, could not refer to work of the kind involved. The court, however, held that the direction of the charter as to the manner of letting public work was applicable, and any other mode of doing so was void. It is significant that the framers of the freeholders' charter omitted from section 27, of article 6, the requirement as to 'plans and profiles.' It seems evident that the Barlow case was in the mind of framers of the instrument, and these words seem to have been left out to avoid any such contention as was made in that case."

In State ex rel. Belt v. St. Louis, 161 Mo. 371, this court held that a contract for erecting boxes on the streets of the city, for the purpose of holding waste paper that might be thrown in them by passers-by, was public work, and must emanate from the Board of Public Improvements. It will be observed in that case, there were provisions of the charter specially applicable to cleaning the streets, and it was said that this work had relation to the cleaning of the streets; yet the court did not base its conclusions, altogether, upon the special provisions; but said, speaking through GANTT, J.:

"Section 27 expressly prohibits the Assembly from directly contracting for 'any public work contemplated by this charter,' which necessarily includes the street cleaning mentioned in section 17. . . . So in this case, this provision of the charter in section 27, one of

the most admirable and salutary in the charter, applies in full force.''

MARSHALL, J., in his dissenting opinion in that case, after a full and careful consideration of the questions presented, clearly and correctly announces the views of this court as to the class of public work contemplated by section 27 of article 6 of the charter. While his views are expressed in a dissenting opinion, it is apparent that as to the application of the terms ''public work,'' there was no disagreement. He says:

''It may be broadly and emphatically stated, therefore, that no contract for any kind, character or species of public work or improvements or repairs thereof or for cleaning streets, is valid unless the ordinance authorizing it is recommended by the Board of Public Improvements, after it has faithfully complied with all charter prerequisites to its action. This proposition can not be stated too strongly or unequivocally. If, therefore, the ordinance before the court in this case contemplates, involves or provides for the doing of any public work or the making of any public improvement, or the cleaning of the streets, it falls within the condemnation of the rule announced, and is void.''

This is in perfect accord with one of the fundamental principles applicable to the construction of statutes: ''That words shall be taken in their plain or ordinary and usual sense.'' The term ''public work'' has no technical meaning, and this charter speaks for itself, it means what it says, and the public work contemplated in section 27, supra, includes every species and character of work done for the public, and for which the taxpaying citizens are liable.

In accordance with the views as herein expressed, it must be held that the provisions of the charter of the city of St. Louis did not authorize the power exercised by the Municipal Assembly, in contracting the public work designated in the ordinance.

This leads us to the consideration of the second

vital proposition involved in this cause. This proposition is pointedly stated under subdivision 4 in the argument of the Circuit Attorney, as set forth in the brief before us. He says:

"Under our view of the law it is immaterial in this case whether the garbage ordinance be valid under the charter or not."

Having reached the conclusion that the Municipal Assembly could not, under the charter, exercise the power of authorizing the Board of Health to contract for the disposal of the garbage, we start out on this proposition that there was no law in force which required Dr. Chapman, in his official capacity as a member of that board, to vote upon or take any action in respect to awarding the contract for the performance of that public work. He could only be required to perform that duty by an authorized ordinance, empowering the Board of Health to make the contract.

We must keep in view the elements of the offense as charged in the indictment. One of the essential elements of this offense is that the attempt to bribe must be in respect to a matter which "may by law be brought before him in his official capacity."

In other words, to state the proposition sharply, there must be a law in force at the time of the attempted bribery, which imposes upon him the duty of acting in his official capacity, upon a subject-matter which may be brought before him. It is not essential, under the statute defining the offense charged, that he should act upon the matter or that the matter should ever come before him, but it is vitally important to constitute this offense, that there should be a law in force at the time the bribe is offered which would cast the burden upon him of acting should the matter come before him.

Unless this duty is imposed upon him by law, there can be no bribery. It will not do to say that there may be in the future a law enacted, which would require the performance of this duty. When will this law be en-

acted—in a month, a year, or in the next century? The offense must be complete at the time of the commission of the act.

The very purpose of the statute is to prevent public officials from being influenced in respect to questions upon which they are authorized to act. How can an officer be influenced to act when there is no law requiring him to do so, and no power under the law authorizing him to act. It may be said that it was thought the power existed and there should be a conviction of bribery or attempted bribery. So it may be said that a witness who swears falsely, as to an immaterial matter, before the court or the grand jury, ought to be convicted of perjury, because he thought it was material; but what court would for a moment hold that a defendant could be convicted for swearing falsely as to matters immaterial to the legitimate subject of inquiry? Why not? Because the law is so written. That is a sufficient answer.

The words in the statute "which may by law be brought before him," must be construed to mean a law in force at the time of the offer to bribe. This is the only reasonable construction of which it is susceptible. The offense must be complete at the time of the offer, and can not be made to depend upon the future action of the lawmakers, who might possibly, sometime in the future, enact a law which would require the officer to act upon questions which may come before him. This would make the offense depend upon a condition or contingency that might never happen. The views herein expressed find support in the cases of In re Yee Gee, 83 Fed. 145; State v. Howard, 137 Mo. 289.

The cases cited by respondent, People v. Markham, 64 Cal. 157, Commonwealth v. Donovan, 170 Mass. 228, do not militate against the doctrine herein announced.

It may be added that this is a statute defining a criminal offense and must be strictly construed. Burgess, J., in State v. Howard, supra, unqualifiedly ap-

proved the announcement of the rule applicable to the construction of statutes of the character of the one before us, by SHERWOOD, J., in State v. Schuchmann, 133 Mo. l. c. 117, where it is said:

"Moreover, the statute is both penal and criminal, and therefore to be strictly construed; construed strictly as to those portions which are against defendants, but liberally construed in those which are in their favor; that is, for their ease and exemption. No person is to be made subject to such statutes by implication, and when doubts arise concerning their interpretation, such doubts are to weigh only in favor of the accused. [Bishop, Stat. Cr. (2 Ed.), secs. 193, 194, 227.]"

In the discussion of this proposition, it is important to keep in view the real questions presented. The proposition we are considering is not that the ordinance did not emanate from the Board of Public Improvements; this is merely a preliminary step, affecting the validity of the ordinance; but the proposition involved is more far-reaching; it challenges the exercise of the power to let a contract for public work by the Board of Health and asserts that the only power to contract for public work as contemplated by section 27 of the charter, is vested in the Board of Public Improvements.

Again, the question as to the official position of Chapman is not involved. No one controverts the fact that he was a member of the Board of Health. The question as to whether he was an officer *de jure* or *de facto* is not before us, but the sole and only question involved in this proposition is, as a member of the Board of Health, was there any duty imposed upon him by law which required him, in his official capacity, to act in the matter of letting the contract for the doing of public work?

The adoption of the ordinance introduced in evidence, being the exercise of a power, not granted by the charter, was invalid. From this, it must logically follow that there was no law in force at the time of the

alleged attempted bribery, which required Dr. Chapman, in his official capacity, as a member of the Board of Health, to pass upon the question of letting the contract for the *public work* to be performed for the city.

We have reached the conclusion that the absence of this essential element of the offense charged, is fatal to this indictment, and that the facts disclosed by the record fail to bring it within the terms of the statute upon which this indictment is predicated.

The questions involved in the case at bar have frequently been in judgment before the courts of this country, and the uniform and unqualified expression of all the courts fully support the views herein expressed and the conclusion reached.

In State v. Collins, 25 Texas (Supp.) 204, the rule as applicable to the case before us is very clearly announced. It is specially applicable for the reason that the indictment was based upon a provision of the Code similar to the one upon which the indictment is based in this cause. ROBERTS, J., speaking for the court, said:

"The indictment in this case is founded on article 250 of the Penal Code, which makes it an offense for any person to offer a bribe to any executive, legislative, or judicial officer, 'with intent to influence his act, vote, opinion, decision or judgment, on any matter, question, cause or proceeding which may be then pending, or may thereafter be brought by law before such officer in his official capacity.' Besides others, the substantial exception was taken to the indictment, that 'the defendant is not legally charged with any crime in said indictment.' This is, in substance, the same as one of the exceptions which the Code permits to be taken to an indictment, to-wit, article 487: '1. That it does not appear from the face of the same that any offense against the law was committed by the defendant.' The indictment states, that defendant offered to bribe the district

attorney, with intent to influence his act, 'as an officer,' in and concerning 'a certain cause or criminal charge and proceeding then and in the district court of said Bexar county pending, it being case No. —— wherein the said A. J. Collins is charged with.' etc.   The omission to state the cause or charge and proceedings, or to give some definite description of it, renders the indictment defective not only in form, but also in substance; because it does not appear to be a matter pending in court, upon which the district attorney was required or authorized by law to act in his official capacity.   The offer to bribe the officer, the intent to influence his official act thereby, in relation to a cause pending in court, may or may not come within the denunciation of the provision of the Penal Code above quoted.   If it relate to a cause upon which the district attorney is required or authorized to act officially, it does; otherwise, it does not.   There should, therefore, be some averment or description which would show it to be such a cause.   The court should have sustained this exception, and for the error in not doing so, the judgment must be reversed.''

It is apparent that the court, in that case, applied the crucial test:   ''Was the proceeding one in which the district attorney was required or authorized to act?'' If it was, it was within the terms of the Code; if not, it was not within the denunciation of the provisions of the Code.   Applying the same rule to this case, if Dr. Chapman was not required or authorized to act, in letting the contract, then the same conclusion as the Texas court reached is inevitable.

We find the same principle announced by the Supreme Court of Illinois, in Gunning v. People, 59 N. E. 494.   The defendant in that case, who held the office of assessor, was indicted and convicted for proposing to receive a bribe, to influence his action in respect to assessment of property.   The proposition was that he would reduce the assessment of the property.   The indictment failed to allege that any of the real estate upon

State v. Butler.

which the assessment was sought to be reduced, was situated in the town of which the defendant was the assessor.    The court, speaking through CARTER, J., said:

"It is not even averred that Gunning, as assessor, had the power or authority to assess the property in question, or to reduce the assessment upon it. It is plain that the indictment should have been quashed."

It is made clear in that case why the Supreme Court declared that it was plain that the indictment should be quashed; it was upon the same principle involved in this case.  The indictment failed to disclose that the assessor was required or authorized to act in respect to the assessment of the property described in the indictment.  If he was not authorized to act, then there could be no bribery to influence his action.

There is no rule so uniformly adhered to by the courts, both State and Federal, as the one "that there can be no bribery of any official to do a particular act, unless the law requires or imposes upon him the duty of acting."   It is bottomed upon the sound and logical principle that he can not be influenced to do something that he has no power or authority to do.   In United States v. Boyer, 85 Fed. 426, a case in the Federal court of the Western District of Missouri, under a Federal statute, defining the offense of bribery of an officer of the United States, the essential elements of the offense were the same as is provided by the Missouri Code.   To indicate their similarity and the application of the decision of the learned judge in the Boyer case, we here quote that part of the Federal statute.   It is provided that the offer must be made to the United States officer, "with intent to influence his decision or action on any question, matter, cause or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit."

In that case, the validity of an act of Congress, con-

ferring authority upon a Government officer, was involved. The court declared the act unconstitutional, and after reaching that conclusion Judge ROGERS, proceeding to dispose of the remaining question before the court, said:

"I think it clear from what has been said that Congress has no power, even if it had done so by express legislation, to create the offices of inspectors, and impose upon them, or upon agents appointed in pursuance of law by the heads of departments, the duties alleged in the indictment. And the question now arises, if this be true, whether or not to offer a person a bribe not to do something which no valid law enjoins him to perform is an indictable offense, under the statute. . . . In United States v. Gibson, 47 Fed. 833, it was held not to be a crime to offer a bribe to an internal revenue officer of the United States with intent to cause him to enter and burn a distillery. The court quashed the indictment, saying: 'The bribe offered was for an act entirely outside the official function of the officer to whom it is claimed the bribe was offered. . . . The allegd offers can not be said to have been made to induce the officer to do, or omit to do, any act in violation of his lawful duty.' In that case, had the internal revenue officer burned the distillery, it would have been no offense against the United States. No duty rested upon him to see that the distillery was not burned. Doubtless, if he had burned the distillery, he would have been guilty of arson under the State statutes, but of no offense whatever against the laws of the United States. In the case at bar, had the inspector received the bribe, it would have been no offense against the laws of the United States, for the reason that it was intended to induce him not to do a thing which no valid law of Congress imposed upon him to do. It would not have been an infraction of the State law, because no State law imposed upon him the duties alleged in the indictment; nor was he an officer of the State. I am unable to per-

ceive, by any course of sound reasoning, that the facts alleged in the indictment constitute an offense against the United States; and, hence, the demurrer should be sustained to each of the three separate counts in the indictment, and the indictment dismissed.''

The learned judge in that case very clearly presents the question involved in the proposition before us in the case at bar. He treats of one of the essential elements of the offense of bribery—that there must be a duty enjoined upon the officer by a valid law, in order to make an offer to such officer bribery within the terms of the statute.

It is true that in the discussion of the case, it is said that there are no common-law offenses against the Government; that the offenses must be defined by the acts of Congress. This does not change the application of the rule announced, to the proposition involved in the case before us. While it is true there are common-law offenses against the State of Missouri, yet it will not be contended that the offense charged against the appellant, in this case, is based upon the common law. He was charged and convicted for the violation of an express statute of this State. The indictment is predicated upon the statute, and this judgment of conviction must stand or fall by its terms. Hence, the principle announced by Judge ROGERS in the Boyer case is directly applicable, with all of its force, to the question now being discussed.

In James v. Bowman, 23 Sup. Ct. Rep. 678, it was held that section 5507 of the Revised Statutes of the United States (U. S. Comp. Stat. 1901, p. 3712) was invalid and that defendant could not be convicted of bribery under its provisions.    Mr. Justice BREWER, after fully reviewing all the authorities pertinent to the questions involved, and declaring that the statute was inoperative, and that defendant could not be tried or convicted for bribery, very clearly and forcibly announced the views of that court in opposition to con-

struing statutes to fit some particular transaction.  He said:

"We deem it unnecessary to add anything to the views expressed in these opinions.  We are fully sensible of the great wrong which results from bribery at elections, and do not question the power of Congress to punish such offenses when committed in respect to the election of Federal officials.  At the same time it is all-important that a criminal statute should define clearly the offense which it purports to punish, and that when so defined it should be within the limits of the power of the legislative body enacting it.  Congress has no power to punish bribery at all elections. The limits of its power are in respect to elections in which the Nation is directly interested, or in which some mandate of the national Constitution is disobeyed; and courts are not at liberty to take a criminal statute, broad and comprehensive in its terms and in these terms beyond the power of Congress, and change it to fit some particular transaction which Congress might have legislated for if it had seen fit."

The Court of Appeals of Kentucky is in harmony with the unbroken line of decisions in adhering to the rule that there must be a duty required to be performed before there can be any bribery in attempting to influence the action of the person upon whom the duty is imposed.

Commonwealth v. Reese (Court of Appeals of Kentucky), 29 S. W. 352, was a case in which the defendant was charged with attempting to bribe a councilman to vote for a particular candidate for the office of "Sealer of Weights and Measures."  It seems that prior to this election, the office sought had been abolished.  It was held that, there being no such office in existence, there could be no bribery in an offer of a bribe to the councilman for his vote to secure it.  It is clear that this ruling is based upon the principle that there being no office in existence, there was no duty

imposed, requiring the councilman to act, and if not required to act, his action was not subject to be influenced.

To the same effect is Kitby v. State (Supreme Court of New Jersey), 31 Atl. 213; People v. Purley, 2 Cal. 564; Newman v. State, 23 S. E. 831; Ruffin v. State, 38 S. W. 169.

Numerous cases are cited by counsel for respondent in the discussion of the proposition now being considered. We have examined them with a marked degree of care and are unable to find in any of them an announcement of a rule, as applicable to the question involved in this case, that is in conflict with the cases cited and reviewed in support of the conclusions reached by this court. An examination of them will demonstrate clearly the line of demarkation between the rules applied and announced in the cases relied upon by counsel for the State, and those which determine the only real question involved. The Attorney-General, in the discharge of his duty to the State, has filed a separate brief covering, in a very careful and painstaking manner, all the questions presented, and we have also the brief filed by the Circuit Attorney, who prosecuted this case in the trial court, presenting his views very carefully and fully upon the propositions now before us. The reasonable limits of this opinion renders it impossible to review all the cases cited. We must, therefore, be content with a discussion of those mostly relied on.

It is well enough to keep closely in view the controverted proposition. The conclusions reached by this court do not dispute that Dr. Chapman was an officer *de jure,* under the city government; secondly, the proposition is not denied that a *de facto* officer is as fully the subject of bribery as an officer *de jure.*

It is not denied that an officer who assumes the duty of an office and performs the functions pertaining to it, can not, in a prosecution for bribery, deny

that he was duly elected or appointed to such office. But the conclusion reached does assert the proposition that, under the terms of the statute, it is an essential element of the offense charged, that there must be a valid law in existence at the time of the offer to bribe, authorizing and requiring the officer to act. Without this, his action is not subject to influence and there can be no bribery within the terms of the statute.

The first case to which our attention is directed is State v. Graham, 96 Mo. 120. The defendant was indicted under the statute denouncing "bribing officers to appoint to office." There was a demurrer filed to the indictment, and the ground alleged in the demurrer was the failure of the indictment to allege that the defendant was eligible to the office. This demurrer was overruled, and correctly so, for the reasons expressed in the opinion of the court, where it was said:

"The indictment in question alleges every fact necessary to constitute the offense defined by the statute. It charges that Rickman was the mayor of the city of Sedalia, and as such had the power to appoint defendant to the office of engineer of the steam fire engine of said city, subject to the confirmation of the city council, and the defendant did feloniously, etc., give to said Rickman twenty-five dollars with the intent to corruptly influence said Rickman as mayor to appoint and procure for him the office of engineer of said engine. It was not necessary under this statute, in order to make a valid indictment, to aver that defendant was eligible to the said office, for the purpose of being appointed to which he gave the bribe. The gravamen of the offense interdicted by the statute is the intention to influence the official action of the officer by giving him a bribe, and this is sufficiently set forth in the indictment."

It is apparent that this case does not conflict with the views of this court as expressed. The statute did not make the eligibility of the defendant an element of the offense, hence it was not necessary to allege it or

prove it. With that case, the correct principle can be demonstrated, beyond dispute: suppose that at the time the defendant offered to bribe the mayor to appoint him engineer of the city of Sedalia, there was no law in existence which authorized the mayor to make the appointment; would it be contended for a moment, even though the defendant offered him thousands of dollars for the appointment, that such act was the subject of bribery? Certainly not. For the plain reason that, as in this case, there is an absence of any law which imposed upon him the duty of such appointment. Again, suppose the indictment in that case had failed to allege the power of the mayor to make the appointment; would any court hesitate for a moment to quash the indictment, for the reason that it failed to charge any offense? Most certainly not. It is stated with great particularity in that opinion, that the indictment alleges "that Rickman was the mayor of the city of Sedalia, and as such had the power to appoint defendant to the office of engineer." Without such averment, the indictment would not have charged any offense.

The case of Florez v. State, 11 Tex. App. 102, involved simply this question: the defendant was indicted and tried for attempting to bribe a deputy sheriff and jailor to release a prisoner. During the progress of the trial, he attempted to show that the officer was not regularly appointed, but was simply a *de facto* officer. The court very properly held that this defense could not be availing; that the legality of the claim of the deputy sheriff to the office, the functions of which he was performing, could not be tested in this way. The *de facto* officer was performing the duties of an officer *de jure*. His acts were valid and he was an officer, as much subject to bribery as one whose title to the office was beyond question.

The law imposes the duty upon the deputy sheriff *de jure*, to safely keep the custody of his prisoner, and the *de facto* deputy was simply performing the legal

duties of the *de jure* officer, and his right to the office can only be tested by the modes pointed out by law. This is not the question in this case.    There is no contention that Dr. Chapman was not an officer *de jure*. The question is, was he corruptly approached about a matter which by law would come before him?    It was incumbent upon the court to determine, as a question of law, whether there was a law in force at the time, which required the matter to be brought before him.

The case of Moseley v. State, 25 Tex. App. 515, is equally without application.    It was held in that case that an officer accepting a bribe for releasing a prisoner, should not be permitted to deny the legality of his own act, by asserting that the arrest was illegal. That is the announcement of a clear legal principle. It will be observed that the officer in that case was authorized by law to make arrests and the only question involved was after having exercised the authority as to the preliminary steps necessary to legalize the arrest.    It was held, and correctly so, that having authority to make arrests and accepting a bribe, to release a prisoner, the preliminary steps were immaterial and he would not be permitted to deny the legality of his acts.    It is very apparent that this case does not militate against the conclusions reached in the one before us, and was never intended to be understood as announcing a different rule, for it was this same court that spoke, in no doubtful terms, in State v. Collins, supra, as to the correct rule applicable to the proposition being discussed.

It was very aptly said in that case that where a defendant was charged with attempting to bribe the district attorney, it was not bribery and not within the terms of the statute, unless it was a matter or proceeding upon which the attorney was authorized and required to act.

The same court, in the recent case of Moore v. State (Court of Criminal Appeals of Texas), 69 S. W.

521, very clearly distinguishes the Florez and Moseley cases from the rule announced in the line of decisions applicable to the question involved. It is made clear that to bring a defendant within the term of the statute for the bribery of a public officer, the offer to bribe must be in respect to the discharge of a legal and official duty. In other words, to more clearly state the proposition, the law must require and authorize the performance of a legal and official duty, before the action of the officer can be subjected to an improper influence that is made the subject of bribery.

The Texas court, in the Moore case, speaking through BROOKS, J., said:

"It will be seen from an inspection of the foregoing facts that appellant was not, in contemplation of law, under legal arrest at the time the offer to bribe the officer was made. This prosecution is based upon article 138, White's Ann. Pen. Code, which provides, 'If any person shall bribe, or offer to bribe any sheriff or other peace officer to permit any prisoner in his custody to escape, he shall be punished by imprisonment in the penitentiary for a term not less than two nor more than five years.' Article 144, White's Ann. Pen. Code, reads, 'By a "bribe" as used throughout this Code, is meant any gift, emolument, money, or thing of value, testimonial, privilege, appointment or personal advantage or the promise of either bestowed or promised for the purpose of influencing an officer or other person, such as are named in this chapter, in the performance of any duty, public or official, or as an inducement to favor the person offering the same, or some other person.' Construing these two articles together, it is made to appear that in order to bribe an officer, as contemplated by article 138, he must be in the discharge of a legal and official duty, and the custody of appellant therefore, must have been a legal custody; otherwise it is not an official act in arresting appellant. The cases of Florez v. State, 11 Tex. App. 102, and

Moseley v. State, 25 Tex. App. 515, 8 S. W. 652, seem to support, upon a casual reading, the State's contention. But a closer scrutiny thereof will make manifest the fact that neither of said cases is in point. The Florez case was an effort on part of appellant to bribe an officer to release him from jail, and the evidence disclosed that appellant was already under judgment of court; and the question of whether or not the mittimus had been issued was held to be immaterial. In the Moseley case, appellant received a bribe to release a prisoner he had illegally arrested. The court held that appellant would be estopped from setting up the illegality of the arrest as a defense to the prosecution. But in the case at bar appellant has nothing to do with the illegality of the arrest, except that, in contemplation of law, he was suffering an injury to his personal rights, by reason thereof. He was not a party to it, he had not acquiesced in it, and could not be estopped from asserting his rights under the conditions and provisions of article 138, White's Ann. Pen. Code. The moral aspect of this question appeals strongly to us, as suggested by appellant's counsel, but we must decide the case according to the statute. The statutes under consideration do not make appellant guilty, under the facts in this record, because appellant was not legally arrested.''

The next case to which our attention is earnestly directed is State v. Ellis, 33 N. J. L. 102. The disclosure of the record in that case clearly distinguishes it from the line of cases which support the conclusion reached by this court. The facts upon which the prosecution was predicated in the case last cited, were about as follows: Application was made to the Common Council of Jersey City to lay a railroad track on one of the public streets of said city, and the defendant offered a bribe to one of the members of the council to vote in favor of the application. The contention was made by the defendant that the city council had no power to

grant the application, hence there could be no bribery. The court ruled adversely to the contention of the defendant upon this proposition, and we fully concur in that ruling. It was clearly correct, as to the case before it, and is in no way in conflict with the conclusions reached in this case. In the first place, the indictment in that case was for a common-law misdemeanor; but, aside from that, the charge contained all the essential elements of bribery. It was immaterial whether the action of the council could be enforced. It was a matter pending before the council, upon which the members had a right to vote. It was not necessary "that the vote, if procured, would have produced the desired result." The simple question was, was the member of the council authorized to vote upon the matter pending? It is very frequently of greater importance to the public for a member of the city council to vote upon a question pending, where the effort is to secure unauthorized legislation, than upon matters fully authorized. Under such conditions, the members of the council are not only authorized to vote; but it is their duty to vote and to vote *NO* and every attempt to influence their action, by the offering of a bribe, in respect to such vote, constitutes the offense of bribery. That the decision in that case is not pertinent to the proposition now being discussed, we think it too plain for discussion.

In Glover v. State, 109 Ind. 391, the defendant was a school trustee. He was indicted for accepting a bribe to enter into a contract for the purchase of school furniture and supplies. It was not questioned that, as such trustee, he had the power and was authorized to make the contract. The indictment properly avers such power and authority. The contention of the appellant was that the contract, as reduced to writing, was not binding upon the school township. The court, upon that proposition, very correctly said:

"It is not material whether the contract entered into could have been enforced against the township or

not. If it was already executed, and the amount paid out of the township funds, of course it could not be material whether or not the contract was in writing. Nor could it be material in any event. The question is not whether appellant entered into a contract binding upon the township, but whether he accepted the bribe.''

That is not this case; but, if on the other hand, there had been no law which authorized and required the school trustee to make the contract, and some person should have attempted to bribe him to make it, then we would have the identical question presented in this case, and it certainly will not be disputed that, in the supposed case, there would be no offense, for the reason that the bribe offered was not in respect to the performance of a legal and official duty, required by law.

In the Ohio case of State v. Gardner, 42 N. E. 999, the question involved was as to the right of defendant, who was charged with bribing an officer, to test, in that proceeding, the right of a *de facto* officer to perform certain duties. It was held in that case that the party charged to have been bribed was a *de facto* officer, and that defendant could not attack the constitutionality of the law creating the office. In this case, the title of Dr. Chapman to the office of membership of the Board of Health is not questioned; nor are the legitimate duties authorized by the city charter questioned. But the sole question is as to the exercise of power by the Municipal Assembly, under the charter, in respect to imposing the duty upon the Board of Health to let a contract for public work. While that case does not necessarily involve the proposition now being discussed, yet upon the question which seemed to have been determined by it, that is, as to officers *de facto* and the right of attacking the constitutionality of a statute creating an office, we will say that it is directly in conflict

with some of the most carefully considered cases in this State.

We will discuss this conflict later in the opinion.

We have examined the Kansas, Iowa and Indiana cases cited, and find that the reasons heretofore assigned are applicable to those cases and that the propositions involved are not the ones presented for our consideration in this case, and do not militate against the conclusions reached.

It is earnestly contended that the validity of ordinance 20476 can not be attacked in this proceeding. In other words, it is urged that it can not be attacked collaterally. In the adjudications of this court applicable to this contention, there is but one exception, and the contention urged does not fall within it. The cases relied upon to maintain this proposition are specially applicable to that one exception.

This court has uniformly and correctly held that when the constitutionality of an act, such as the organization of a county or of a court, depends upon facts extraneous to the legislative act, then the courts will not undertake, in either a criminal or civil proceeding, to investigate the facts upon which the constitutionality or unconstitutionality of such an act must rest. On the other hand, as the history of our adjudications will bear witness, there never has been a case in this State where the court, either in a criminal or civil proceeding, has refused to declare an act of the Legislature or an ordinance invalid, when by a comparison with the organic law its invalidity could be ascertained.

Our attention is directed to the cases of State v. Rice, 20 Mo. 393, State v. York, 22 Mo. 462, State v. Wiley, 109 Mo. 442, as supporting the rule invoked in this contention. These cases all determine the same question, and no expression by this court in the present opinion can more fully demonstrate that they have no application to the attack upon the validity of the ordinance in this proceeding, than the clear announcement

of the court itself, in one of the cases cited. In passing upon the question before it, in State v. Wiley, supra, GANTT, J., speaking for the court, said:

"That this court may declare an act of the Legislature unconstitutional when it transcends the limits prescribed by the organic law, is now accepted by all branches of the government, but it is equally well determined that the invalidity of the statute must clearly appear, before the court will assume so serious a function. Ordinarily, these questions arise from the face of the act itself, but here a comparison of the act of the Legislature with the Constitution will not disclose any conflict. It is clear that if a county has a population of fifty thousand the Legislature may establish a criminal court for it. The power to create the court depends upon a fact '*in pais*,' something extraneous to the act. It was the duty and the right of the Legislature to determine before passing the act, to inquire and ascertain, that Greene county had the requisite number of inhabitants. A proper respect for a co-ordinate branch of the government compels us to presume that they did make the proper investigation and found from the facts that they were not infringing the Constitution. The court was accordingly established, and the practical question now arises, must this court and its officers, every time an indictment is found and a prisoner put on trial, submit, as a preliminary question, to an investigation of the fact of the existence of fifty thousand inhabitants in Greene county on April 26, 1889?"

The same distinction is drawn in State v. Layton, 160 Mo. 474.

That is not this case. We take judicial notice of the provisions of the charter of the city of St. Louis, and the ordinance is before us, having been introduced in evidence, and from them, and not any extraneous facts, we determine the power of the Municipal Assembly to adopt the ordinance.

The Ohio case, State v. Gardner, heretofore ad-

verted to, is cited as maintaining this contention. That case seems to hold that there can be a *de facto* officer without any *de jure* office, and that the constitutionality of an act creating an office can not be called in question in a prosecution for bribery of an officer who assumes to perform the duties under the act creating the office. This is in direct conflict with the decision of this court in Ex parte Snyder, 64 Mo. 58. The petitioner, Snyder, in that case, was convicted of grand larceny, and sent to the penitentiary and was there confined at the time of his application. This court held, in that proceeding, that the act of the Legislature creating the probate and criminal court of Cass county, was unconstitutional, and that the acts of the judge, in sending the petitioner to the penitentiary, were void. The application of Snyder involved the performance of duties by a public officer. It was not a direct proceeding to declare that act unconstitutional; in fact, no such proceeding is provided for. It was the ordinary application for writ of habeas corpus. The same question would have been determined upon appeal. After disposing of the first question as to the validity of the act, this court, speaking through SHERWOOD, J., said:

"We are thus led to the discussion of our second point, and respecting this there would, owing to the disposition made of the first point, appear to be but little difficulty. Numerous cases can be instanced from the books, where the acts of an incumbent of an office have been held valid, upon the ground that such incumbent was an officer *de facto*. But an officer of that description necessarily presupposes an office which the law recognizes. And a quite extensive research has failed to discover an instance where an incumbent has been held an officer *de facto*, unless there was a legal office to fill; and all the cases cited from our own reports were of that sort."

It is apparent that the announcement of the rule

in the Gardner case, is not in accord with the settled law and practice of the courts of this State.

Our attention has been directed to the case of State v. Williams, 136 Mo. 293. It does not support the contention in respect to the collateral attack upon this ordinance. That was an indictment and conviction for an attempt to corruptly influence a juror, in the case of State v. Taylor. The Taylor case was tried and the court passed upon the competency of the jurors, and it was its province to pass upon any irregularities, in summoning the panel. The defendant challenged the correctness of the indictment, for its failure to contain an averment that the panel was summoned by order of the county court. The court correctly held that such allegation was not necessary. The failure of the county court to order a summons for the panel of jurors is not a matter of defense, to the offense of corruptly attempting to influence a juror; that was a question to be settled and presumably was settled, in the case in which the jury were summoned. The rule announced in that case does not, in any manner, conflict with the firmly established practice of attacking the validity of an ordinance or act of the Legislature, in any proceeding in which they are involved.

There is no direct proceeding known to the law by which an invalid act of the Legislature, or ordinance, can be set aside, but the universal rule and practice in this State has been that whenever an ordinance or act of the Legislature is invoked to support any civil or criminal proceeding, their constitutionality may be put in issue and may be attacked.

To hold otherwise would overthrow the settled practice of this State, ever since this court was organized, as indicated by the innumerable cases in which such practice was adopted. State ex rel. Belt v. City, supra, was not a direct proceeding to set aside the ordinance in that case; the ordinance involved provided for the imposition of certain duties upon the members of the

Board of Public Improvements. The proceeding was to compel the board to perform the duty imposed. This court held the ordinance requiring the performance of that duty void and of no effect.

United States v. Boyer, supra, was not a direct proceeding to invalidate the act of Congress creating the office and authorizing the Government officers to perform the duties of it, in pursuance of the act. It was simply a criminal prosecution for bribery of a public official, yet it was held by Judge Rogers, in that proceeding, that the act of Congress was in violation of the Constitution. Hence, there was no law requiring the performance of any duty and there could be no bribery in attempting to influence the action of the officer.

This brings us to the consideration of the last proposition in this cause.

Counsel for defendant urge that even though the Municipal Assembly of the city of St. Louis had the authority to enact ordinance No. 20476, and that the contract was not void because it was not let by the Board of Public Improvements, because the gathering, removal and reduction of garbage was not *public work* within the meaning of the charter, still the conviction of defendant can not stand, because the ordinance *was not approved* by the mayor until September 17, 1901, as shown by the State's own unchallenged documentary evidence. It will not be questioned that there was no statute of the State of Missouri which required Dr. Chapman, as a member of the Board of Health, to vote or pass upon defendant's bid for the contract for the disposal of all slops, offal, garbage, etc., of the city of St. Louis by the Merz process, neither was any such obligation cast upon him by the common law.

The State is therefore relegated to *an ordinance* of the city of St. Louis. No other ordinance is relied on save ordinance No. 20476 approved by the mayor September 17, 1901. Now, if the defendant made his prop-

osition to give Dr. Chapman $2,500 if he would vote for defendant's company to get the contract before the ordinance was approved by the mayor, as required by the charter, it is obvious defendant was not guilty of an attempt to bribe, for the reason that there was no ordinance which made it the duty of Dr. Chapman to vote or pass upon defendant's bid. About this proposition there can be no cavil.

By the charter of St. Louis, the mayor is a part of the lawmaking, or ordinance-enacting, power of the city government, and his concurrence in legislative action is essential to its validity, unless the ordinance is passed over his veto. [Secs. 23, 24 and 25, art. 3, charter of St. Louis; Eichenlaub v. City of St. Joseph, 113 Mo. 395.]

If, in fact, then, the alleged attempt to bribe was committed by defendant after the Council and House of Delegates had passed ordinance No. 20476, but before its approval by the mayor, there was no ordinance requiring the Board of Health to make any contract for the removal or reduction of garbage, and, hence, no duty in respect thereto which could be brought before Dr. Chapman as a member of the Board of Health in his official capacity. Was the alleged offer to bribe thus made before the approval of the ordinance by the mayor? On this point there was one witness only, Dr. Chapman himself. He testified there was no one present but himself and defendant at the interview. He was asked if he saw the defendant "on or about the 16th or 17th of September, 1901." He answered that he did, and then detailed what occurred between defendant and himself.

Question by Circuit Attorney: "That was about what day?" Ans. "I would fix that date around about the 16th of September, 1901." Having testified about another meeting or visit on November 1, 1901, he was again asked by the Circuit Attorney: "What was the date of the first visit?" Ans. "September 16th,

about." On cross-examination, by Judge Krum, coun-
sel for defendant, he was asked: "How are you able
to state the 16th of September as the date upon which
this first interview occurred?" Ans. "I don't quite
know how far I can proceed in answering that." Q.
"Well, proceed as far as you can and we will determine
how successful you have been?" Ans. "On September
22nd, the wife of a very dear friend of mine returned
from Europe to St. Louis." Mr. Folk: "Give the
name." A. "Mrs. Bell; I had told her husband —"
Judge Krum: "Well, I object." Witness: "You asked
it from me. I had told her husband previous to her
returning. The date of telling her husband ,was on
Monday, and if I recollect it properly, *the Monday* pre-
ceding her return to St. Louis was the 16th day of
*September.*" Q. "You then fix the 16th of September
by reason of your having told some one of this occur-
rence between the defendant and yourself?" A. "Yes,
sir." Q. "Now, when was it you told this person of
this occurrence?" A. "I told him *definitely* on the
Monday preceding the return of his wife from Eu-
rope." Q. "His wife returned on the 22d?" A.
"Yes, sir." Q. "And you told your friend definitely
on the Monday before her return?" A. " Yes, sir."
Q. "Do you know what day of the week the 22d .day
of September of last year was?" A. "My recollec-
tion was it was Sunday." Q. "Then according to
that the 16th would be on Monday?" A. "That is
my recollection of it." Q. "Yes; you are quite posi-
tive that it was on the 16th?" A. "On or about the
16th." Q. "Very well. You have said you told your
friend whose wife returned on the 22d of this occur-
rence on the Monday before her return; do I under-
stand that to be the same date on which you had the in-
terview with Mr. Butler?" A. "*I state that the in-
terview with Mr. Butler was on or about the 16th and
I definitely told him* [his friend] *about it on the 16th.
That is what I have stated.*" Q. "Then it must have

occurred before you told your friend?" A. "It must have, yes, sir." Q. "So you told your friend during the evening of that 16th?" A. "Yes, sir." Later on, the witness was asked: "Why do you say, 'On or *about* the 16th?'" A. "For the simple reason that that is exactly the date I mean—on or about the 16th." Q. "You say here positively that you told your friend of this occurrence as early as the 16th of September, don't you?" A. "Yes, sir." Q. "Therefore, your interview with Mr. Butler must have occurred before you told your friend?" A. "Yes, sir." Q. "It either occurred earlier on the 16th than the point of time at which you told your friend or else it occurred before the 16th. In either event, it occurred before the ordinance was approved by the mayor?" A. "I don't know anything about the approval of the ordinance at all." Again: Q. "You are, however, able to locate the 16th of September as the date of this interview, from the fact that you told your friend about it; that is the only reason for stating it?" A. "Yes, sir." The witness was interrogated as to a conversation with Claud Wetmore and was asked: Q. "Now, at that interview, didn't you state to him that you were unable to recall exactly the date of Mr. Butler's first visit?" A. "I did, sir." Q. "Why is it you are able to recall it now?" A. "Because the incident of Mrs. Bell's return from Europe has come up since that date. My knowledge of the date of the incident has come since that." Q. "She returned as early as the 22d of September, 1901?" A. "Yes, sir." Q. "You had told her husband as you say on the 16th of September, 1901?" A. "Yes, sir."

The foregoing is all the evidence on the part of the State as *to the time when* the alleged attempt to bribe Dr. Chapman was made.

The approval of ordinance No. 20476 was on the 17th day of September, 1901, as appears by the official communication of the mayor to the Council on that day.

The entire evidence of Dr. Chapman is to the effect that the offer to bribe him was made on the 16th day of September, 1901. It is true that Dr. Chapman says in his examination in chief, that the offer was made *"on or about* the 16th day of September, 1901," but his cross-examination discloses beyond the peradventure of a doubt that it was on Monday, the 16th of September, 1901. If Dr. Chapman's evidence is to be believed, and he is vouched for by the State, and certainly we have no desire to question it, the offer of defendant could not have been made later than the 16th, for while he persisted in saying *"on or about* the 16th of September, 1901,"* when questioned as to his interview with defendant, when he was interrogated as to the *time he told* his friend Bell of defendant's offer, he positively fixes it on the evening of September 16, 1901, or the Monday preceding the 22d day of September, 1901, which was the 16th. So that, in justice to him it must be said that the only doubt he felt about the date of the attempted bribe was whether it might not have been prior to the 16th, but never later than that day. And this is not a case of an inadvertent reference to a date, but it is fixed by the return of Mrs. Bell from Europe on the 22d of September, 1901, and the positive remembrance that on the Monday preceding the 22d, he told her husband of the offer. Nor was the fixing of this date a matter of which the witness had no notice. On the contrary, the importance of fixing the date of an attempted bribe had been impressed on him, and on a previous occasion, he had stated to Mr. Wetmore that he could not definitely fix it, and subsequent to that interview with Wetmore, he had inquired and his attention had been called to Mrs. Bell's return on the 22d, and then he could positively say that on the 16th of September, 1901, he had told her husband of the attempt to bribe him. So that the State's own witness fixes the date as the 16th of September, as the very latest time at which the offer to bribe could have been made to

him. But counsel for the State answer that this was submitted to the jury under proper .instructions and the jury found the fact against defendant; in other words, that, although there was absolutely no evidence that the offense was committed after the approval of ordinance No. 20476, the defendant is precluded by a finding by the jury that he made the offer *after* the 17th of September, 1901, when for the first time the ordinance became a municipal law. The courts give full effect to a verdict when there is substantial evidence to support it, or when the evidence is contradictory, but when there is no evidence upon which to base it, they are not bound by it.

Moreover, this is not a case where the date is immaterial; a case in which variance of a day or two could be disregarded without affecting the rights of the defendant. The question of time is all-important to the defendant with reference to the ordinance which the State asserts authorized and empowered the Board of Health to let the contract and accept bids for the removal of offal and garbage.

Until the ordinance was passed and approved, to-wit, September 17, 1901, there was no law by which the letting of the contract could come before the Board of Health. Obviously, then, the burden was on the State to prove, beyond a reasonable doubt, that the offer to bribe was made *after* the ordinance was approved by the mayor, and testimony merely to the effect that it was made "on *or about the 16th of September, 1901*," would not meet the requirement; but when the State went further and established beyond all cavil that the offer was made *on* or *before* the 16th of September, 1901, and the records of the city conclusively established that the ordinance was not approved until the 17th of September, 1901, it is evident that the State failed to make a case, even if the ordinance had been a valid one. This verdict can only be accounted for,

however, by the third instruction given to the jury on behalf of the State.    That instruction is in these words:

"If you believe and find from the evidence beyond a reasonable doubt that the ordinance aforesaid numbered 20476 was passed by the Municipal Assembly of said city of St. Louis by a majority vote of the said Council and House of Delegates, respectively, in the month of September, 1901; and that it might therefore become the duty of the said Board of Health as aforesaid to advertise for such sealed proposals as aforesaid under the terms of said ordinance and to enter into a contract as aforesaid with the best bidder therefor; and that afterwards and before any such sealed proposals were received or such contract awarded by such Board of Health, the defendant, Edward Butler, knew that such ordinance had been so passed by the Municipal Assembly aforesaid, knew that it would or might be the duty of said Board of Health to advertise for such sealed proposals as aforesaid, knew that the said Board of Health would or might be authorized to let said contract as aforesaid to the best bidder therefor, knew that said Board of Health would be authorized and have the right to reject any or all of any such sealed proposals, knew that the said Henry M. Chapman was a member of the said Board of Health, knew that the said St. Louis Sanitary Company was a corporation, and was about, or intended, to make to said Board of Health a sealed proposal for the sanitary disposal of all slops, offal, garbage, vegetable matter and animal matter of said city under the 'Merz process;' and that the defendant, Edward Butler, at any time between the passage of said ordinance and the opening of any such sealed proposals, at the said city of St. Louis, did unlawfully, corruptly, and feloniously offer and propose to pay to the said Henry M. Chapman the sum of $2,500, or any other sum of money, with the intent then and there unlawfully and

corruptly to influence the opinion, decision and vote of the said Henry M. Chapman as a member of the said Board of Health and in his official capacity and character as a member of the said Board of Health, for and in favor of a sealed proposal of said St. Louis Sanitary Company, or to award such contract to said St. Louis Sanitary Company, for the sanitary removal of all slops, offal, garbage, vegetable matter and animal matter of the city of St. Louis by the 'Merz process,' under the provisions of said ordinance, then you should find the defendant guilty of an offer and attempt to bribe an officer, as charged in the indictment, and unless you do believe and find, beyond a reasonable doubt, it is your duty to acquit him.''

The jury were not advised in this instruction that the ordinance was not legally passed until the approval of the mayor on the 17th day of September, 1901.

This was a matter of law which the court should have told the jury in plain terms. On the contrary, the jury might well have concluded that if the ordinance was passed by the Council and House of Delegates before the 17th, as it was, and thereafter it might become the duty of the Board of Health to advertise and receive bids, it would be sufficient, even though not approved by the mayor. Thus the jury was not required to find that the alleged offer of defendant was made to Dr. Chapman *after* there was a law or valid municipal ordinance in force, by which the matter might be brought before Dr. Chapman in his official character or capacity, but until then, as we have seen, no such duty existed, and, hence, the claim that the jury found as a fact that the offer was made *after* the ordinance was approved, is unsupported by the facts in evidence.

We have thus given expression to our views upon this cause, as disclosed by the record before us, which results in the final conclusion that the learned and esteemed trial judge should have either sustained the de-

murrer to the indictment, or, at the close of the State's case, given the peremptory instruction to find the defendant not guilty as requested by counsel for appellant.

The judgment in this case will be reversed, and the defendant discharged. *Gantt, P. J.,* and *Burgess, J.,* concur.